TRILOGY COMMUNICATIONS,
INC., Plaintiff,

v.

COMM SCOPE COMPANY, M/A–Com,
Inc., M/A–Com Cable Home Communi-
cations Corp. and General Instrument
Corp., Defendants.

No. ST–C–86–139.

United States District Court,
W.D. North Carolina,
Statesville Division.

March 26, 1990.

Karl S. Sawyer, Jr., Dalbert U. Shefte, Charlotte, N.C., Joseph V. Colaianni, Pennie & Edmonds, Washington, D.C., for plaintiff.

John J. Barnhardt, James D. Myers, Dickson M. Lupo, Bell, Seltzer, Park & Gibson, Charlotte, N.C., for defendants.

## MEMORANDUM OF DECISION

WOODROW WILSON JONES, District Judge.

The Plaintiff, Trilogy Communications, Inc. brought this civil action against the Defendants, Comm Scope Company, M/A–Com, Inc., M/A–Com Cable Home Communications Corporation and General Instrument Corporation alleging infringement of United States Patent Nos. 3,567,846, 3,693,250 and 3,529,340. The Defendants deny infringement and seek a declaratory judgment of invalidity, unenforceability and non-infringement of the patents in suit. After considerable discovery the issues were tried to the Court in January 1990 at Statesville, North Carolina and the parties were invited, but not required, to file proposed findings and conclusions and post-trial briefs. Counsel for both sides elected to file proposed findings and conclusions as well as post-trial briefs. After full consideration of the pleadings, evidence, briefs, proposed findings and conclusions and arguments of counsel the Court now enters

its findings and conclusions in this Memorandum of Decision.

## FINDINGS OF FACTS

### A. Parties, Jurisdiction and Venue

1.

Trilogy Communications, Inc. (Trilogy) is a Delaware corporation with its principal office and manufacturing facility located in Pearl, Mississippi.

2.

Comm Scope Company (Comm Scope) is a North Carolina corporation with its principal office in Hickory, North Carolina and a manufacturing plant in Catawba, North Carolina, both the office and the plant being located within the Western District of North Carolina.

3.

M/A–Com, Inc. (M/A–Com) is a Massachusetts corporation with a principal place of business located in Burlington, Massachusetts. M/A–Com is a holding company that owns a significant amount of the stock of Defendant, M/A–Com Cable Home Communications Corp. (Cable Home Communications). At the time this litigation began Comm Scope was a wholly-owned subsidiary of Cable Home Communications.

4.

During the course of this litigation, General Instrument Corporation (General Instrument), a New York corporation with its principal office in New York City, acquired a majority of the stock of Comm Scope from Cable Home Communications. Sometime thereafter most of the stock of Comm Scope was purchased by a number of individuals.

5.

In the original complaint the Plaintiff named only Comm Scope and M/A–Com as party defendants but by an amended complaint named Cable Home Communications and General Instrument as additional party defendants.

6.

The parties do not dispute jurisdiction and venue and the Court finds that it has jurisdiction of the parties and the subject matter of the pleadings under 28 U.S.C.A. Section 1338 and venue is proper in this district under 28 U.S.C.A. Section 1400(b).

### B. The Patents in Suit

7.

United States Patent No. 3,567,846 ('846 patent) entitled "Metallic Sheathed Cables with Foam Cellular Polyolefin Insulation and Method of Making" issued to General Cable Corporation as assignee from Fred F. Polizzano and William J. Brorein, on March 2, 1971. The application which matured into this patent was filed on May 31, 1968 (PX–4).

8.

United States Patent No. 3,693,250 ('250 Patent) entitled "Method of Making Metallic Sheathed Cables with Foam Cellular Polyolefin Insulation and Method of Making" issued to General Cable Corporation as assignee from Fred F. Polizzano and William J. Brorein, on September 26, 1972. The application which matured into this patent has an effective filing date of May 31, 1968 (PX–12).

9.

United States Patent No. 3,529,340 ('340 patent) entitled "Apparatus for Making Metallic Sheathed Cables with Foam Cellular Polyolefin Insulation," issued to General Cable Corporation as assignee from Fred F. Polizzano and William J. Brorein, on September 22, 1970. The application which matured into this patent was filed on August 13, 1968 (PX–1).

10.

It is admitted by the parties that Trilogy owns these patents in suit having acquired them through its purchase of that portion of General Cable's business relating to the manufacture and sale of coaxial cables. This purchase also included an assignment of all of General Cable's rights to claims for past infringement of the patents.

Trilogy filed its complaint on September 19, 1986 alleging that Comm Scope's QR products, and the method and apparatus by which they are manufactured infringe Claims 1, 2, 3, 6, 7 and 8 of the '846 patent;

Claims 1, 2, 4, 6, 8 and 13 of the '250 patent and Claims 1, 2 and 3 of the '340 patent. Trilogy also alleges that Comm Scope's adhesive P–III product infringes Claims 1, 2, 3, 6, 7 and 8 of the '846 patent. The Defendants answered on November 12, 1986 wherein they denied infringement and counter-claim for a declaratory judgment of invalidity, unenforceability and non-infringement of the patents in suit.

### C. Coaxial Cables

11.

The patents "in suit" relate to a method and apparatus for making electrical cable and to the product resulting from the method and apparatus. The accused product is called a coaxial cable which is defined in the dictionary as a cable that consists of a tube of electrically conducting material surrounding a central conductor held in place by insulators and that is used to transmit telegraph, telephone and television signals of high frequency. All coaxial cables, both those referred to in the patents in suit and those of the prior art, consist of an inner metallic conductor, sometimes called a center conductor, surrounded by insulation to form a "core." The center conductor and the insulation surrounding it are referred to, collectively, as a "core," but the "core" has also been used to refer to one or more conductors without individual insulation. The insulation, sometimes called "dielectric," is surrounded by an outer metal conductor, sometimes called a "sheath" or "shield" typically made of aluminum. Many cables, both before and after the inventions alleged in the patents in suit, have an outer layer of polyethylene that is applied in melted condition to "or extruded" upon the exterior surface of the outer conductor. This plastic hardens as it cools to form a "jacket," which helps to protect the cable from moisture and damage that may occur during installation. The heat that is applied to the foam dielectric by this extrusion is called the "heat of jacketing."

12.

There are two types of coaxial cable used in the cable television (CATV) business at this time and they are referred to as either "trunk" or "dropwire." Trunk cable is of relatively large diameter and is used to transmit signals from receiving stations along an area distribution network. Dropwire cable is much smaller and more flexible and is used to transmit a signal from trunk cable to individual homes. Dropwire cable and the method and apparatus used by Comm Scope to make it is not at issue in this litigation.

13.

Prior to the inventions alleged in the patents in suit there were several conventional methods and apparatus for the manufacture of coaxial cables of the "trunk" type. For example, it was conventional to extrude foamed polyolefin onto a center conductor in a continuous process to form the cable "core." It was a metallic conductor around the core either by longitudinally wrapping and overlapping a strip (or tape) of metal around the core, or by placing a core in an oversized welded or seamless tube, and thereafter "sinking" or "swaging" the tube down unto the core. "Swaging," which was known in the art well before the inventions alleged in the patents, consists essentially of a process of reducing the circumference of a tube or "sheath" by forcing the tube through one or more reducing dies. (See United States Patents Nos. 3,430,330 and 3,553,811 to Garner, filed December 30, 1965.)

14.

During the litigation Trilogy acknowledged that it does not practice any of the inventions alleged in the patents in suit. It does manufacture a coaxial cable product known as "MC2," but this product is a "disc" type cable wherein the center and outer conductors are separated by periodically spaced plastic discs, rather than foam.

### D. The Accused Products, Process and Apparatus

15.

The evidence shows, and Comm Scope admits, that it manufactures and sells several types of trunk coaxial products. Among these products are the "QR" and "P–III" coaxial cables. Both of these cables have a solid metallic inner conductor

and a tubular metallic outer conductor sometimes called a "shield," with foamed polyolefin insulation between these conductors. In the case of the QR cable the foam is adhered to the outer conductor by means of a heat activated adhesive. The P–III cable is of two types, "adhesive P–III," wherein the foam is adhesively bonded to the outer conductor, and "regular P–III," in which the foam is adhered to the outer conductor by means of compression without an adhesive.

16.

In this litigation Trilogy alleges and contends that Comm Scope's QR product and the method and apparatus by which it is manufactured infringe Claims 1, 2, 3, 4, 6, 7 and 8 of the '846 patent, Claims 1, 2, 4, 6, 8 and 13 of the '250 patent, and Claims 1, 2 and 3 of the '340 patent. Trilogy also contends that "adhesive P–III" infringes only Claims 1, 2, 3, 6, 7 and 8 of the '846 patent. None of the other claims of the patents are alleged to have been infringed. "Regular P–III," which is Comm Scope's biggest selling trunk coaxial cable product is not alleged to infringe any of the patents in suit.

17.

The evidence shows that the product QR is a jacketed coaxial cable made by conventional welding, swaging and jacketing techniques. QR differs from the prior art primarily in that it has a relatively thin outer conductor, and a relatively thick foam dielectric, features that are the subject of Comm Scope's own patent, United States Patent No. 4,472,595 to Fox issued September 18, 1984, (PX–58), which is not at issue in this litigation.

18.

The foam dielectric insulation of QR cable is adhered to the outer conductor by a heat activated adhesive that is applied to the core in aqueous form, dried and eventually activated by the heat of jacketing. This adhesive is an ethylene acrylic acid copolymer (EAA) of the general type developed for use in the manufacture of electrical cables and disclosed to the cable industry by employees of Dow Chemical Company in the early 1960's, several years prior to the inventions alleged in the patents in suit. See DX–222 through DX–224 ("Dow Chemical Zetabon Plastic Clad Metals," "Dow Chemical Zetabon A 282," and "Dow Chemical Zetabon A 280," 1965 Zetabon brochure published by Dow Chemical Co.); and see DX–5, (United States Patent 3,795,540 to Raymond C. Mildner of Dow Chemical Co., "the Mildner '540 patent"). The adhesive used in adhesive P–III is essentially the same as the adhesive used in the QR product, and it is applied to the core in essentially the same way. The heat applied to the core to dry the EAA adhesive is called the "heat of drying," and it is applied before the cable is swaged and has been measured in the range of 900° F to 1100° F.

19.

The method and apparatus by which QR and adhesive P–III are made are essentially the same method and apparatus as were used to make foam coaxial cables prior to the inventions alleged in the patents in suit. QR is made by extruding foam polyethylene dielectric around a metallic center conductor, thereby forming a "core," and then continuously wrapping the core in a longitudinally welded outer aluminum conductor which is subsequently "swaged" down upon the core by a reducing die, essentially as disclosed in the prior art Garner '330 patent. A polyethylene jacket is then extruded over the outer conductor, and the cable is quickly quenched in a swirling bath of cool water. The heat of jacketing activates a Dow Chemical type adhesive, thereby bonding the foam to the outer conductor, as disclosed in the Mildner '540 patent. This Mildner patent (DX–5), which is prior act under 35 U.S.C.A. Section 102(e), explicitly teaches using the heat of jacketing to activate the EAA adhesive and bond plastic and metal parts of a cable together, including the core to the outer conductor. (See Col. 6, lines 41–46). Adhesive P–III with a jacket is made in much the same way as QR products, except that P–III products employ a "seamless tube" as an outer conductor, rather than a continuously welded outer conductor. An employee of Comm Scope who was previously employed by Su-

perior Cable, Comm Scope's predecessor testified that, in the case of at least one manufacturing line, the extruder for applying a jacket to the cable is the same extruder that was used to apply jackets to coaxial cable products known as "Alumagard" made by Superior Cable, as early as 1963. The evidence shows that part of Comm Scope's adhesive P–III production is unjacketed. In the unjacketed cable, the adhesive, when used, is activated by a gas flame. The evidence shows that this flame imparts less heat to the foam than the heat of jacketing. Neither the gas flame apparatus nor the method of its use is alleged to infringe the '250 or '340 patents in suit.

### E. Non–Infringement of '846 and '250 Patents

20, 21.

The Court must determine from the evidence whether these two products, that is, QR and adhesive P–III, and the method and apparatus infringe the claims of the patents in suit. The '846 and the '250 patents stem from a common original application filed on May 31, 1968. (See DX–6 '846 patent and DX–7 '250 patent). All of the claims of the '250 patent and all but two (Claims 7 and 8) of the asserted claims of the '846 patent are limited to "fusion bonding" of an electrical cable or to a cable wherein the foam insulation is "fusion bonded," to the "sheath" or "shield," which in a coaxial cable is also called the outer conductor. Therefore, the threshold infringement issues are the meaning of "fusion bonding" and whether QR and adhesive P–III cables are "fusion bonded" within the meaning of the patents in suit.

22.

Ordinarily technical terms like these are defined in the patent but "fusion bonding" and "fusion bonded" are not defined in either of these patents. The meaning of these terms were disputed at trial. Witnesses called by Trilogy defined the terms broadly, so as to include bonding with virtually any heat sensitive adhesive, even if the underlying foam is not melted and caused to produce the results referred to in the patents in suit. On the other hand, witnesses called by Comm Scope testified that "fusion bonding" and "fusion bonded" as used in the patents are more narrow terms and require relatively high heat so as to melt a substance, in this case polyethylene foam, and cause it to flow onto the surface and thereby "stick" to another material, in this case, aluminum. According to this latter definition, an "adhesion promoting material" might or might not be present in a "fusion bond," but its presence would not relieve the need for heating the foam to a high temperature sufficient to cause it to melt and flow and produce the results referred to in the patents in suit.

23.

While the specifications of the patents in suit do not provide an explicit definition of "fusion bonding," the patents do provide information as to how this bonding is to be achieved. In the '250 and '340 patents it is stated that "fusion bonding" of the foam core of an electrical cable to the outer conductor or "shield" is accomplished by using relatively high heat of between 300° F and 850° F, preferably supplied by electrical induction heaters, for a duration of between two (2) and ten (10) seconds, depending upon the size of the cable and upon whether an "adhesion promoting material" is used. The EAA adhesive developed by Dow Chemical Company in the prior art is among the substances listed in the patents as "adhesion promoting materials." The '846 patent encompasses an electrical cable having foam insulation which has been fusion bonded to the sheath or outer conductor.

24.

A careful reading of the specifications and prosecution history of the '846 and '250 patents reveal that the heating technique set forth produces several results. The compression exerted on the foam as a result of reducing the size of the outer conductor during the swaging process is supposedly relieved, because the outer area of the foam is "melted." In addition, the melted foam is said to "flow" into and fill up "any" irregularities in the inner surface of the metal outer conductor, thereby forming a "hermetic seal" between the foam

and the outer conductor. (See DX–6 '846 patent, Col. 2, lines 3–19 and File History of the '846 patent CDX–13, Amendment dated February 24, 1970, p. 3.)

### 25.

During the prosecution of the original application the Patent Office Examiner rejected it on the grounds that there was nothing new over the prior art. In order to overcome the rejection, General Cable's patent counsel repeated and emphasized the importance of several of the features of "fusion bonding" referred to in the patents in suit. (See DX–83, amendment of February 24, 1970, pp. 2–3). These representations emphasized the importance of "melting" the foam and causing it to "flow" into "any irregularities" and forming a "hermetic seal" between the foam and the outer conductor. Because of these representations the Examiner withdrew his rejection and the original application resulted in the '846 and '250 patents. Under these circumstances the present owner of the patents should not be permitted, in effect, to disregard the specific representations upon which the patents issued by contending now that filling up merely "some" of the irregularities, is equivalent to filling up "any" irregularities or by contending that, merely "softening" the foam is equivalent to melting the foam and causing it to flow and form a hermetic seal.

### 26.

There appears in each of the patents in suit the following representation:

If the sheath is not completely round then the softened foam will accommodate itself to any lack of circularity.

E.g. '846 patent, DX–6. The heat of jacketing, as applied by Comm Scope, does not permit the foam to accommodate itself to any lack of circularity in the outer conductor.

### 27.

There also appears in the patents in suit the statement that annealing the outer conductor is an important purpose of the heat treatment of the invention. For example

the '846 patent, DX–6, Col. 4, lines 44–53, states:

In addition to the bonding of the foamed insulation to the sheath and the equalizing of the pressures in the insulation, the heating of the sheath by the heater 40 serves another important purpose. In the use of aluminum and copper sheaths, the metal is work-hardened by the sinking operation which reduces the diameter of the sheath to fit snugly around the insulated core. This harding makes the cable stiff. The heating of the sheath in accordance with this invention anneals the sheath and substantially increases the flexibility of the cable.

See also DX–14, pp. 2–3 (Conception Memorandum). The evidence is undisputed that the heat of jacketing as used by Comm Scope in the manufacture of QR and adhesive P–III products is insufficient to anneal the metal.

### 28.

The co-inventor of the patents, William Brorein testified that fusion bonding requires not just any heat but "controlled heating" to accomplish the foregoing objectives. The only devices specifically disclosed in any of the patents in suit for obtaining "controlled heating" are electrical induction heaters referred to in the text of each of the patents and shown schematically as coils (items 40 and 60) in Figures 1 and 2 in the drawings of all the patents. E.g., '846 patent, DX–6, Col. 3, lines 3–6. Induction heaters are not used to heat QR or adhesive P–III coaxial cable after the swaging operation, and the heat of jacketing, which is applied in the manufacture of these cables, provides 40° F less heat to the foam than the lowest temperature referred to in the patents.

### 29.

The evidence shows that the only heat treatment applied to the QR and the allegedly infringing jacketed P–III products after the swaging operation is the heat of jacketing. However, in using the heat of jacketing to activate the EAA type adhesive in QR and adhesive P–III products, Comm Scope is merely following the prior

art. For example, the Mildner '540 patent stated:

In a preferred embodiment, an out (outer) jacket ... of polyethylene composition is extruded over the shield, *the heat of extrusion being usually sufficient to bond the metal shield to the respective neighboring plastic parts thereby forming an air-tight moisture-resisting mechanically strong cable composition.*

DX–5, Col. 6, lines 41–46 (emphasis added).

30.

The evidence at trial shows that the heat of jacketing applied by Comm Scope in producing the QR and adhesive P–III cables imparts no more than 260° F to the exterior of the foam for a period of less than two (2) seconds after which the heat is quenched in an agitated water bath, in much the same way that the heat of jacketing was applied and then quenched in producing jacketed "Alumagard" cables as early as 1963.

31.

Although jacketed cables, such as jacketed "Qualfoam" made by General Cable, were old in the art at the time of the inventions alleged in the patents in suit—as was the use of the heat of jacketing to activate an EAA adhesive—none of the patents refers to the heat of jacketing. Mr. Brorein, a named inventor, testified that he considered the heat of jacketing, as applied by General Cable prior to the inventions alleged in these patents, to be "inadequate" and "not controlled." He also acknowledged that he deliberately left any reference to the heat of jacketing out of the patents.

32.

The evidence shows there are important functional distinctions between generating a temperature in an outer conductor using an electrical induction heater and extruding a jacket of melted polyethylene heated to the same temperature onto the conductor. An expert witness, Kenneth Bow, a research scientist employed by Dow Chemical Company, testified at trial that an electrical induction heater instantaneously generates approximately the same amount of heat throughout the metal, in this case the outer conductor, such that the upper and lower surfaces of the metal receive the same amount of heat. On the other hand, he explained that a portion of the heat imported to the upper surface of the outer conductor by the heat of jacketing is dissipated while traveling through the aluminum, such that the lower surface of the aluminum reaches a significantly lower temperature than the upper surface of the aluminum. This difference is important because it indicates that the foam insulation of QR and adhesive P–III cable does not achieve a temperature nearly as high as the temperature of the melted polyethylene extruded onto the surface of the outer conductor. This is confirmed by the test results presented by the parties at trial. These results clearly show that the highest temperature experienced by the foam after swaging is 260° F, which is about 125° F less than the temperature of the melted polyethylene jacketing material and significantly less than the lowest temperature specifically referred to in the patents in suit.

33.

Although the heat of drying as applied in QR and adhesive P–III production lines may cause some melting of the exterior of the foam polyethylene prior to swaging, the heat of jacketing is not sufficient to melt the foam. Additionally, Comm Scope demonstrated at trial, by means of a portion of QR type cable made without an adhesive, that the heat of jacketing, as applied by Comm Scope, is not sufficient to cause foam polyethylene to fuse to an aluminum outer conductor, and will not bond the foam to such an outer conductor unless an adhesive of the general type found in the prior art and disclosed in the Mildner '540 patent is also used.

34.

Comm Scope also demonstrated that the heat of jacketing, as applied to QR and adhesive P–III cables, does not produce the results referred to in the patents in suit and their file histories. Photomicrographs of the QR and P–III products produced under Comm Scope's direction show that

there is no appreciable "melting" and "flowing" of the foam in either product. These photomicrographs show that there are actually cellular voids throughout the foam, including its exterior surface, which resembles, in appearance, Swiss cheese, DX–158. Obviously, these voids are not able to "fill up" irregularities in the interior surface of the outer conductor, and their very presence prevents the formation of a "hermetic seal," facts that were demonstrated during the testimony of Brian Garrett, an engineer for Comm Scope.

### 35.

Photomicrographs presented by Trilogy (PX–186–194) tend to contradict the one offered by Comm Scope but the Court finds them entitled to less weight than those offered by Comm Scope for the following reasons. First, Trilogy's photomicrographs were obtained from only a single specimen of completed cable while Comm Scope's were taken from several different specimens at different locations throughout the production process. Mr. Garrett testified that cable samples can vary a great deal depending on the specific location from which they were obtained and the specific portion of the cable from which they are cut. Second, Trilogy's photomicrographs evidence fails to account for the heat of drying, which the evidence shows may heat the foam to as much as 1000° F prior to swaging, and can cause a thin layer of foam to melt and form a "skin" before swaging. Mr. Garrett testified that the heat of drying is necessary to dry off the water in which the EAA adhesive used by Comm Scope is dispersed. This is done before swaging and is not alleged to be part of the "post heating" process to which the patents in suit refer. Third, Trilogy's expert, though clearly qualified in his field, was generally unfamiliar with the manufacture of coaxial cable and acknowledged that he had never visited Comm Scope's plant or seen any coaxial cable produced. In contrast, Mr. Garrett, who supervised Comm Scope's efforts, is thoroughly familiar with the method and apparatus by which the cables are made and did account for the heat of drying. Fourth, some of the test results presented by Trilogy's ex-

pert were necessarily based upon "simulated" cables rather than real cables. These "simulated" cables were produced under laboratory conditions by estimating the heat of jacketing as applied by Comm Scope and without taking the heat of drying into consideration. In fact, the temperatures used to make the simulated cables were about 100° F higher than the temperatures of the heat of jacketing as actually applied to QR and P–III by Comm Scope.

### 36.

Trilogy contends that cables produced in accord with the inventions alleged in the patents in suit have improved structural return loss ("SRL"). However, Mr. Garrett of Comm Scope testified to tests he made wherein he measured the structural return loss of QR and jacketed P–III and unjacketed products that were otherwise the same and found that, on the average, the heat of jacketing as applied by Comm Scope either does not materially affect structural return loss or slightly worsens (increases) it. (DX–153 and DX–157).

### 37.

The Court finds that Trilogy has failed to sustain its burden of proving by a preponderance of the evidence that the QR and adhesive P–III cables made by Comm Scope are fusion bonded within the meaning of Claims 1, 2, 3, 4 and 6 of the '846 patent or that the method by which QR is made entails the step of "fusion-bonding" as required by Claims 1, 2, 4, 6 and 8 of the '250 patent, or heating a cable so as to "fuse" its foam insulation to its outer sheath, as required by Claim 13. By way of summary the evidence shows that both QR and adhesive P–III cables are made with a prior art adhesive using a method and apparatus that were conventional in the art before the inventions alleged in the patents in suit. The adhesive was developed by Dow Chemical Company specifically for the electrical cable industry, to be used essentially as Comm Scope uses it. The evidence further shows that the QR and adhesive P–III products do not achieve the results referred to in the patents in suit. The heat applied in the process is less than that called for in the patents, the

foam is not "melted" by the heat of jacketing and caused to "flow" into "any irregularities" in the outer conductor. The voids which exist in the exterior surface of the outer conductor are not filled by the heat of jacketing and therefore a hermetic seal is not formed. The heat of jacketing as applied to these products is in accord with the prior art. The heat is not sufficient to anneal the aluminum, does not cause the foam to accommodate itself to any lack of circularity in the outer conductor, and does not, on the average, produce an improvement in structural return loss.

### 38.

Comm Scope acknowledged at trial that Claims 7 and 8 of the '846 patent literally read on the QR and adhesive P–III products. The Court would therefore find these claims to have been infringed by these products if the claims are valid and enforceable. However, as will be shown later in these findings and conclusions the Court finds and concludes that these claims are invalid and unenforceable.

### 39.

The heat of jacketing as applied to the QR and adhesive P–III products made by Comm Scope cannot be deemed to be the equivalent of fusion bonding, as required by the patents in suit for the following reasons. First, the heat of jacketing, as applied by Comm Scope, provides at least 40° F less heat to the foam than the lowest amount of heat referred to in the patents and does not achieve most of the results set forth in the patent. Second, the heat of jacketing applies significantly less heat than that required to fuse polyethylene foam to an aluminum sheath. Third, an inventor, Mr. Brorein, testified that the heat of jacketing was "inadequate," "not controlled" and was therefore intentionally left out of the patents, and did, in effect, acknowledge, that it was not an equivalent. Fourth, the use of the heat of jacketing to activate EAA adhesive, as used by Comm Scope in the production of these products, was a part of the prior art and is specifically disclosed, for example, in the Mildner '540 patent, DX–5, Col. 6, lines 42–46.

### F. Non-infringement of '340 Patent

### 40.

■ Trilogy contends that Comm Scope's QR product infringes Claims 1, 2 and 3 of the '340 patent, but asserts no claim of infringement against the adhesive P–III product. Claim 1 is the only independent claim of the '340 patent. This claim specifically calls for two items that are not present in the apparatus used to produce the QR product, namely (1) "a heater station including a heater," and (2) "the heater being correlated with the speed of the means for advancing the cable." There is no heater apparatus in the QR production line after the swaging operation. The heat of jacketing cannot be deemed to be an equivalent of such an apparatus for the following reasons, first, the heat of jacketing was known and applied in the prior art using essentially the same apparatus in essentially the same way that is applied in making the QR product. (For example, Alumagard, see also Mildner '540 patent, DX–5); and second, the heat of jacketing is not applied in substantially the same way (i.e., no induction heater for obtaining "controlled heating") and does not achieve many of the results as set forth with respect to the heater apparatus claims of the patents as Mr. Brorein acknowledged.

The extruders used to extrude a jacket upon the QR product are the same kinds of extruders that were conventional in the art several years before the inventions alleged in the patents in suit. In addition the evidence shows that the heat of jacketing, as applied by Comm Scope, is not "correlated" with the speed of any means for moving the cable along the production line. The temperature of heat of jacketing, as applied to QR, is not significantly varied, and the temperature of the polyethylene that forms the jacket remains essentially the same regardless of the speed of the QR production line. For these reasons, the Court finds that Claim 1 of the '340 patent cannot be deemed to have been infringed by the apparatus used to manufacture the QR product.

**41.**

Claims 2 and 3 of the '340 patent are dependent from Claim 1 and have not been infringed by the apparatus used to manufacture the QR product for the same reasons that Claim 1 is not infringed. In addition, Claim 2 and 3, (the latter being dependent from Claim 2) require that the heater have a capacity "sufficient to fuse the foam which is in contact with the inside surface of the sheath." The evidence shows that the heat of jacketing, which Trilogy contends is an equivalent of the heater apparatus referred to in the claims of the '340 patent, lacks this capacity. See DX-167 (sample of QR cable produced by the usual method on the usual apparatus but without an adhesive and has no bond between the foam and the outer conductor). The Court therefore finds that Claims 2 and 3 of the '340 patent have not been infringed by the apparatus used by Comm Scope to make the QR cable product.

### G. Invalidity

**42.**

The Court now turns to the question of the validity of Claims 7 and 8 of the '846 patent. The evidence discloses and the Court finds that every element set forth in Claims 7 and 8 of the '846 patent in suit was disclosed in the specifications of the Mildner '540 patent (DX-5) and that those claims are therefore anticipated under 35 U.S.C.A. Section 102(e). In addition the Court finds that the subject matter claimed in each of the asserted claims of the patents in suit would have been obvious to a man of ordinary skill in the art at the time the alleged inventions were made and are therefore invalid under 35 U.S.C.A. Section 103.

**43.**

Trilogy contends that the '846 and '250 patents should be accorded an enhanced presumption of validity because the art cited by Comm Scope is no better than the art considered by the Examiner in allowing the patents in suit to issue. However, as shown, in part, by the testimony of two expert witnesses, Kenneth Bow, an independent technical expert and John Wither-

spoon, a former member of the Board of Patent Appeals, Trilogy's argument is incorrect. The Mildner '540 patent is more pertinent to the inventions alleged in the '846 and the '250 patents than any of the "secondary references" cited by the Examiner for use in conjunction with the primary reference, the Garner '330 patent (DX-3). Although the Examiner cited a French patent to Dow Chemical Company that contains some of the disclosure of the Mildner '540 patent, the '540 patent is much more comprehensive than the French patent, especially with respect to coaxial cables. In contrast to the text of the Mildner '540 patent, the text of the French patent does not refer to coaxial cables and does not state that the EAA adhesive can be applied directly to the core, as typically would be done in the case of a swaged coaxial cable. Whole sections of the text of the Mildner '540 patent are absent from the French Dow patent, as evidenced by DX-5B, a copy of the Mildner patent with highlights in the French patent. The record seems to indicate that the Examiner did not speak French, did not fully appreciate even the limited text of the French patent, and did not actually apply the text of said patent in making any rejection. He cited the French patent as evidencing a cable having more than one inner conductor, which is apparent from one of the drawings of the French patent, without the text. In the same action, the Examiner stated that the pending Brorein and Polizzano claims were directed simply to cable made by the process of the Garner '330 patent (DX-3) that was "fusion bonded." See DX-83 (file history of the '846 patent; office action dated 12-8-69, p. 3). If the Examiner had appreciated that the French patent taught "fusion bonding," as Trilogy now concedes, he surely would have applied the French patent to reject the pending claims of the Brorein and Polizzano applications.

### H. Anticipation of Claims 7 and 8 of the '846 Patent

**44.**

■ An element-by-element of the claims of the '846 patent is as follows:

Claim 7: An electrical cable including a conductor core, insulation surrounding the core including a foamed dielectric,

a metal sheath surrounding the insulation and holding the foamed dielectric under some compression,

and a thin layer of adhesion-promoting material on the outside of the foamed insulation between the foam and the metal sheath and bonded to both the foam and metal sheath.

Col. 6, lines 43–49.

Claim 8: The electrical cable described in Claim 7 characterized by

the adhesion-promoting material being from the group consisting of amorphous polypropylene and polypropylene copolymers, and copolymers of polyolefin and acrylic acid.

Col. 6, lines 50–53. Claim 8 is dependent from Claim 7 and therefore contains all of the elements of Claim 7 plus the specific adhesive composition that Claim 8 specifies. Claim 8 includes what is known in patent practice as a "Markush group." *See, Ex Parte Markush*, 1925 C.D. 126, 340 O.G. 839. This means that Claim 8 would cover a product according to Claim 7 in which the adhesion-promoting material would be *either* amorphous polypropylene and polypropylene copolymers *or* copolymers of polyolefin and acrylic acid.

45.

For sometime before the alleged inventions in the '846 patent was made, and more than one year before the filing of the application that resulted in the patent, several cable manufacturers had made and sold coaxial cable having a center conductor core foam polyethylene insulation surrounding the conductor core, and an outer metal sheath holding the foam dielectric insulation under compression. See e.g. DX–37 ("Alumagard" brochure); Deposition of William J. Brorein, October 27, 1985, which was read into the record at trial. Product of this type was described in United States Patent 3,430,330 to Garner (DX–3).

46.

In the early 1960's, more than a year prior to the filing of the application that resulted in the '846 patent, employees of Dow Chemical Company, including Ray Mildner (now deceased), developed and disclosed an ethylene acrylic acid copolymer (sometimes referred to as EAA) for use in manufacturing electrical cables. This adhesive was used to bond plastic to metal, and the application that resulted in Mildner's patent '540 disclosed the use of his EAA adhesive to bond electrical cable core structures having plastic insulation to outer metallic sheaths. DX–5 (Mildner '540 patent); DX–222 through DX–224 (Dow brochures).

47.

The Mildner '540 patent specifically discloses surrounding a foamed plastic around internal conductors and surrounding this circular core with a metal sheath:

Figs. 2A and 2B show a typical three-conductor power cable. The low resistance *Metal Conductors* 21, which can be solid or stranded, usually of copper or aluminum, are each insulated, usually with an extruded plastic cover 22 of polyvinyl chloride, polyethylene or rubber, sometimes with impregnated paper. Space fillers 23 of hemp, *foamed plastic,* or the like are *used to provide a substantially circular core assembly which is enclosed in a metal sheath* or shield 24, which can be of any ductile metal, usually lead, copper or aluminum. The shield is preferably a seamless tube or a welded or soldered tube.

DX–5 (Mildner '540 patent), Col. 4, lines 60–69 (emphasis added).

48.

The Mildner '540 patent specifically discloses including an adhesive copolymer of ethylene and unsaturated carboxylic acid (EAA adhesive) between the metal sheath and the underlying foam core to bond the metal sheath to the neighboring plastic part:

In preferred embodiments, of this invention, the metal shields 24, 33, 45 and 54 shown in FIGS. 2, 3, 4 and 5, respective-

ly, are tapes of aluminum or copper or other suitable metal, which tapes have been *coated preferably on both sides, with the specified copolymer of ethylene and unsaturated acid....* In a preferred embodiment, an out jacket 26, 35, 47 and 57 of polyethylene composition is extruded over the shield, the heat of extrusion being usually sufficient to *bond the metal shield to the respective neighboring plastic parts* thereby forming an air-tight, moisture-resisting, mechanically strong construction.

*Id.,* Col. 6, lines 21–46 (emphasis added). The adhesive described in the Mildner '540 patent as a "copolymer of ethylene and an ethylenically unsaturated carboxylic acid such as acrylic acid" is a copolymer of polyolefin and acrylic acid. By basic chemical definition, a polypropylene substance is a polyolefin. See, e.g., Webster's Ninth New Collegiate Dictionary, 1988, defining ethylene as an olefin.

49.

The Mildner '540 patent specifically discloses the advantages gained by bonding the metallic sheath to the adjacent plastic materials:

A combination of these alternatives can be used to provide the advantages of the improvement of this invention in *securely bonding any of the metal parts of a conductor to any of the neighboring thermoplastic parts through a boundary layer of the specified adhesive binder,* i.e., the defined copolymer of ethylene and unsaturated acid, at their common surface of contact, the particular mechanical design being selected by the manufacturer to accomplish the purpose desired. Thus, *cables built in accordance with this invention with metallic parts such as shields securely bonded to a neighboring part, such as core or jacket or both through a boundary layer at their common surface of contact are resistant to intrusion of fluids between the neighboring parts.* In such cables having bonded parts in accordance with this invention, tensile or compressive force applied to one of the parts is transmitted to the other, whereby the cable resists relative displacement and separation of the parts.

*Id.,* Col. 4, lines 12–29 (emphasis added).

50.

The Mildner patent discloses utilizing pressure or compression to accomplish the desired bonding with the adhesive:

One advantage of using the ethylene copolymer with ethylenically unsaturated acid as specified in this invention is that the copolymer readily forms a strongly adhesive bond with the metal and such bond is readily formed at mild conditions and with only minor changes in the procedures used in cable manufacture. Moreover, no rigorous cleaning or pretreatment of the metal surface is required. Excellent bonds have been obtained to metal surfaces contaminated with oil. *To obtain a good bond,* it is only necessary that the adhesive polymer wet the substrate surface and this is readily achieved by *employing the polymer in a fluid state and under sufficient pressure to provide good* contact between the parts.

*Id.,* Col. 7, lines 17–29 (emphasis added).

51.

The Mildner '540 patent also discloses applying the adhesive or bonding material to the insulated core structure:

It will be evident to those skilled in the art that the improvements of this invention can be obtained by modifying conventional wire and cable constructions and fabrication methods in various ways. In some instances, the thermoplastic composition for use in fabricating a part can be composed in whole or in part of material capable of bonding to the metal part, i.e., the defined ethylene-unsaturated acid copolymer. Thus, for example, a conductor can be covered with an insulating sheath by extrusion of a thermoplastic insulation composition comprising the defined copolymer to provide a bonded sheath. This technique also provides an insulated core whose exterior surface is comprised of the defined polymer and is suitable for application of a

metal shield, e.g., a longitudinally folded metal strip or helically wound tape or the like, which thereby becomes bonded to the core through the surface of defined copolymer. Alternatively, *an insulated core structure can be fabricated from conventional materials in the usual way to provide a conventional plastic part, and (prior to adding the metal shield) the outer surface of the pre-fabricated core can be provided with a continuous surface layer or coating of bonding material such as the defined adhesive polymer whereby the subsequently applied metal shield becomes bonded to the insulated core structure,* e.g., through the intermediate surface of the defined copolymer. In another embodiment, the metal strip or tape to be used in construction can be first provided with a coating or covering layer of the defined adhesive polymer or other bonding material on one or both sides of such metal strip or tape which is then fabricated into a shield over the core, being bonded thereto through the coating or layer.

*Id.,* Col. 3, lines 32–64 (emphasis added).

### 52.

The above-cited portions of the Mildner '540 patent were included in the original application for that patent which was filed on November 22, 1963. This was prior to the time that the alleged invention of the '846 patent was made. See DX–232 (Mildner '540 file history). Plaintiff's response to Defendants' First Set of Requests for Admission No. 5.

### 53.

Trilogy contends that the Mildner '540 patent does not teach or disclose a cable wherein the metal sheath holds the foamed dielectric under compression, as required by Claims 7 and 8. However, these claims do not require any particular amount of compression, but merely "some" compression, and the Mildner patent specifically states that pressure—hence "some compression"—is to be applied in bonding the metal sheath to the core. DX–5, Col. 7, lines 17–29. The fact that the patents in suit do not require high compression is underscored by their specifications, which note the advantage of using low compression. For example, the '846 and '250 patent specifications state: "When the foam insulation is heat-bonded to the metallic sheath, *lower initial compression may be used when the sheath is applied over the foam core,* thus minimizing the dielectric compression problem." DX–7, Col. 2, lines 20–24 (emphasis added). Moreover, the Mildner patent discloses cable structures that can be made only by swaging, a process that inherently applies at least "some compression" to the core (e.g., Figs. 2A and 2B, and several references to the use of "seamless" aluminum sheaths, such as Col. 4, lines 70–75). The Mildner patent also refers specifically to "coaxial metal shields," (Col. 1, lines 46–55) and discloses application of the adhesive to the core, which is the typical manner in which adhesive is applied by Comm Scope in the manufacture of QR and adhesive P–III. Thus, the application of "some compression" is not only specifically disclosed in the Mildner reference but inherent in practicing the Mildner disclosure.

### 54.

The evidence indicates that those coaxial cables made in accord with the "Zetabon" pre-coated tape embodiments of the Mildner '540 patent (which was not swaged) have at least "some" compression applied to the foam by forming rollers that press the outer conductor against the foam. "Zetabon" is the trade name of an aluminum tape made and sold by Dow Chemical Company for use as an outer conductor or shield in coaxial and other electrical cables. The witness Kenneth Bow of Dow Chemical explained at trial the process of making these cables and that it involved compressing the foam. See DX–257, DX–258, DX–259 and DX–260, and testimony explaining pressure exerted in making this type of cable. In addition Mr. Bow testified that he had tested "Sealmetic" coaxial cable (DX–148–1 through DX–148–3) made in accord with the pre-coated "Zetabon" tape embodiments of the Mildner patent. This "Sealmetic" cable has polyethylene

foam insulation and an outer aluminum conductor wrapped, like cigarette paper, around the foam and adhered to itself by means of EAA adhesive. Mr. Bow testified that his tests and measurements showed the foam core in this type cable was under substantial compression. Frank Drendle, President of Comm Scope, who has been in the electrical cable business since the early 1960's testified that some "Sealmetic" type of cable was made having the outer aluminum conductor adhesively bonded to the foam core. (See DX–248, sketch made by Mr. Drendle at trial). This adhesively bonded cable was sold in the United States in 1964 and is therefore prior art under 35 U.S.C.A. Section 102(b).

55.

By way of summary, each element recited in Claims 7 and 8 of the '846 patent is present in the disclosure of the Mildner '540 patent, and each element is united in an electrical cable, in the same way to perform the identical function. It therefore follows that these claims were anticipated under 35 U.S.C.A. Section 102(e).

### I. Obviousness of the Asserted Claims of the '846 and '250 Patents

56.

■ Based upon the construction of the Garner '330 patent (DX–3) and either the Mildner '540 patent or Lamons United States Patent 3,173,990 (DX–9), the subject matter set forth in each of the claims of the '846 and '250 patents asserted in this action would have been obvious to a man of ordinary skill in the art at the time these alleged inventions were made. In addition, the subject matter set forth in these claims would have been obvious to a man of ordinary skill in the art within the meaning of 35 U.S.C.A. Section 103 who was informed of the effects of the heat of jacketing on Qualfoam coaxial cable made and sold by General Cable Company more than one year prior to the filing of the first application resulting in the patents in suit.

57.

The evidence reveals that the level of skill in the cable design art at the time of the alleged inventions in the patents in suit was high. A highly qualified witness, Kenneth Bow of Dow Chemical Company, who was personally involved in the art at the time of the inventions testified that research workers in the art held at least an electrical or chemical engineering (B.S.) degree and some had taken additional graduate courses. Most of these workers had several years experience in research and development and were exposed to problems, needs and developments in the industry, including the CATV coaxial cable industry. They all had access to various publications and trade symposia such as the Annual Wire and Cable Symposium which was usually attended by various employees of General Cable. Examples of papers presented at these meetings included a paper entitled, "Adhesive Thermoplastic Copolymers for the Wire and Cable Industry," by G.E. Clock, G.A. Klumb and R.C. Mildner, given at the Twelfth Annual Wire and Cable Symposium, Asbury Park, New Jersey, (December 4–6, 1963) (DX–16), and "Recent Developments in Small Core Coaxial Cable," (DX–44), given at the same 1963 symposium. These workers had the skill to employ adhesives to bond foam to the sheath or outer conductor of swaged coaxial cables, such as Qualfoam, DX–21.

58.

At the time of the alleged inventions claimed in the patents in suit the scope and content of the electrical cable art were very extensive. See DX–254A through DX–254C (outline prepared by Kenneth Bow of significant developments in cable design art). The art included telephone cables, coaxial cables and power cables of various sizes and applications, (e.g., DX–5, Mildner '540 patent, which refers to all three general types of these cables), as well as a variety of different methods and apparatus for manufacturing these cables. It was known to use foam polyethylene insulation and the swaging technique to make coaxial CATV trunk cables, such as "Qualfoam" made by General Cable and "Alumagard," made by Superior Cable. See, e.g., DX–3 (Garner '330 patent regarding swaging); deposition of William J. Brorein, dated

March 12, 1987 (swaging was "conventional" by 1962 or 1963); DX–37 ("Alumagard" brochure); deposition of Jerzy Olszewski, December 4, 1987 (read into evidence at trial) (foam dielectric insulations known to be desirable since the turn of the century). It was also known that some form of adhesion between the foam dielectric insulation of a coaxial cable and the outer conductor to prevent water migration and reduce problems of differential expansion. (Olszewski's deposition, December 2, 1987); see also DX–21 (evidencing some of the skill in the art). Adhesive for use in bonding plastic core elements to the outer shield or conductor of a coaxial cable had been developed and disclosed to the art at least as early as 1963. DX–16; DX–44; DX–5; DX–222 through DX–224; DX–248.

59.

The Garner '330 patent (DX–3) discloses a method and apparatus for manufacturing a swaged coaxial cable having a welded aluminum outer conductor. In addition the swaging process was disclosed prior to the alleged inventions in the patents in suit in at least two publications, including "Communication Cables with Welded and Corrugated Metallic Sheaths" by Andresen and Stein, which was presented at the Eleventh Annual Symposium on Technical Progress in Communication Wires and Cables in Asbury Park, New Jersey, on or about November 28, 1962 (DX–117, p. 3) and "Aluminum Sheathed Cables" by P.M. Hollingworth and R.A. Raine, Proceedings of Institution of Electrical Engineers, Vol. 101, Part 2, p. 608 (1934) (DX–116).

60.

The evidence discloses without question that by the early 1960's swaging had been a conventional way to manufacture coaxial cables. Both Mr. Olszewski of General Cable and Mr. Brorein, one of the inventors, also of General Cable, testified by way of depositions read at the trial that the swaging procedure was a conventional way to manufacture coaxial cables before the inventions claimed in the patents in suit.

61.

Trilogy claims that the amount of compression called for in the patents in suit and the reduction of this compression resulting from heating of the cable, causing the softened foam to flow into irregularities in the outer conductor is an important part of the invention. However, at trial, Richard Asdourian, a former employee of General Cable who was knowledgeable about the manufacture of Qualfoam coaxial cable, testified that the "optimum" compression for practicing the fusion bonding method and producing the fusion bonded cables of the patents in suit was 8 mils, which is within the preferred range explicitly disclosed in the prior art, Garner '330 patent. (DX–3, Col. 4, lines 6–10, stating preferred range of "between about 5 and 15 mils"). The Garner patent discloses the method by which unjacketed Qualfoam coaxial cable was manufactured by General Cable several years prior to the inventions alleged in the patents in suit. Thus Trilogy's contentions about the results of compressing the cable and heating it amount to little more than a statement of results that are inherent and unavoidable when coaxial cable produced in accord with the preferred embodiment of the Garner '330 patent is heated.

62.

The claims of the '846 and '250 patents that are asserted in this action essentially relate to an electrical cable made by the swaging process having a polyolefin foam insulation that is "fusion bonded" to the outer sheath. The patents state that fusion bonding can be effected by heat alone, without an adhesion promotion material (e.g. DX–7, '250 patent, Col. 4, lines 21–36). However, in order to make out any case of infringement against the Comm Scope product, Trilogy necessarily has had to contend that "fusion bonding" should be given a broad definition, so as to include virtually any bonding of polyethylene foam to an aluminum sheath using a heat activated adhesive. By Trilogy's definition, the adhesive bonding technique disclosed in the Mildner '540 patent constitutes "fusion bonding" and its expert witness, Dr. Ordway specifically acknowledged this during cross examination.

**63.**

Accepting Trilogy's broad definition of "fusion bonding," the issue is whether it would have been obvious to a man of ordinary skill in the art in the mid–1960's to have used an adhesive as disclosed in the Mildner '540 patent to adhesively bond the foam of a swaged type cable, such as Qualfoam, to the outer conductor of this cable. The evidence shows, clearly and convincingly, that the answer must be in the affirmative. Indeed, the problems encountered in Qualfoam type cables are essentially the same problems to which the disclosure of the Mildner '540 patent was directed.

**64.**

Even though Trilogy's expert witness, Dr. Ordway, testified that the Mildner '540 patent teaches "fusion bonding," according to Trilogy's broad definition of the term, Trilogy argues that it would be inappropriate to use the disclosure of the Mildner '540 patent together with the disclosure of the Garner '330 patent because the Mildner '540 patent does not explicitly use the term "swaging" or "swaged cable." This argument is without merit for several reasons. First, by its own terms (e.g., Col. 3, lines 32–35), the disclosure of the Mildner '540 patent is intended for use with many different cable constructions and cable types, specifically including coaxial cables (e.g., Col. 1, lines 46–59), referring to "coaxial metal shields" and associated plastic dielectric (see also Fig. 5). Second, the Mildner '540 patent specifically refers to cables having "seamless" or "welded" outer conductors, (e.g., Col. 4, lines 70–75; Figs. 2A, 2B), which various witnesses testified would be swaged in order to produce a tight fit around the core; and the Mildner patent states that the EAA adhesive may be applied directly to the core, which is how the EAA adhesive is typically applied to swaged cable (e.g. Col. 3, lines 50–58). Third, the text of the Mildner patent indicates that the EAA adhesive to which the patent refers was developed, among other things, to solve or lessen moisture penetration problems, differential expansion problems (or relative movement of cable parts), and damage by bending and repeated bending over a short radius. For example, Col. 4, lines 20–34, of the Mildner patent states:

> Thus, cables built in accordance with this invention with metallic parts such as shields securely bonded to a neighboring part such as a core or jacket or both through a boundary layer at their common surface of contact are *resistant to intrusion of fluids between the neighboring parts.* In such cables having bonded parts in accordance with this invention, *tensile or compressive force applied to one of the parts is transmitted to the other, whereby the cable resists relative displacement and separation of the parts.* Such bonded cables are resistant to damage by pulling through ducts and conduits and by suspending unsupported between widely separated poles or towers. Also, such cables are *resistant to damage by short radius bending and by repeated bending and straightening.* (emphasis added)

The evidence indicates that these are largely the same problems to which the patents in suit were addressed. It would have been obvious to a man of ordinary skill in the art to look to the Mildner disclosure to help in solving these problems. The EAA adhesive and its use in various cable constructions were disclosed in prior art other than the Mildner patent, notably DX–16, a 1963 paper co-authored by Mildner and presented to a trade seminar.

**65.**

The obviousness of employing an adhesive such as the Dow EAA between the foam insulation and the outer conductor of a swaged coaxial cable was also apparent from General Cable's Qualfoam manufacturing techniques as early as 1965. It is undisputed that, even before the inventions alleged in the patents in suit, adhesion between the foam and the inner and outer conductors of coaxial trunk cables was known to be necessary and desirable. General Cable's 1965 and 1966 specifications relating to commercial Qualfoam stated that this adhesion was necessary and prescribed standards (including a "pull test")

for determining whether adequate "adhesion" had been obtained. Paragraph 3.1 of General Cable's DS–1135–B specifications for testing Qualfoam stated that "the adhesion between the [inner] conductor and insulation, and between insulation and sheath [outer conductor] shall be as specified below...." (emphasis added). The specifications go on to prescribe specific pounds of "pull" depending upon the size of the cable. See DX–49, p. 3, § 3.1 (July 6, 1966 specification); DX–41, p. 3 of December 2, 1965, Design Specification for 75 ohm Qualfoam Coaxial Cables (1965 specification). This adhesion was achieved by a friction or compression fit; however, if one wanted to increase this adhesion—and it is clear that an increase was desirable to prevent such problems as differential thermal expansion or water penetration—there was hardly any more obvious way than to use an adhesive. By definition, an adhesive increases adhesion.

### 66.

The obviousness of using an adhesive such as that developed by Mildner to bond the foam core to the inner and outer conductors of a swaged coaxial cable is also indicated by General Cable's own experience with respect to differential expansion encountered with Qualfoam cable. Differential expansion occurs when, the parts of a cable that experiences rapid temperature changes expand at different rates, thereby causing separation of the parts and relative movement between them. This can cause cable connectors to fail. In 1963, Joe Masterson, a General Cable employee, wrote an internal memorandum, DX–21, received by Mr. Brorein in which Masterson reported on the problem of differential expansion experienced with Qualfoam coaxial cable, a swaged product having a welded outer conductor and foam polyethylene dielectric insulation. Mr. Masterson concluded that this problem, could be solved by using adhesives to bond the foam to the inner and outer conductors in a way similar to that taught in the Mildner '540 patent. While this internal document does not constitute prior art, it does serve to indicate the level of the skill in the art prior to the inventions alleged.

### 67.

It is also contended by Trilogy that it would not have been obvious to have used the disclosure of the Mildner '540 patent with that of the Garner '330 patent because there was no known technique using EAA adhesive in a cable construction that was to be swaged. Comm Scope replies that the weakness of this contention is apparent from the fact that the patents in suit do not disclose any technique for using an adhesive with a swaged cable and that if this contention were true the patents would have been unworkable. The evidence indicates that there were techniques for applying EAA adhesive to cable components that were to be swaged. For example, United States Patent 3,183,300 issued to General Cable upon an application filed in early 1963, notes that the Dow EAA adhesive was available in "film form" and notes that this film could be applied to various cable components. DX–86, Col. 3, lines 25–31. DX–44, a 1963 technical paper notes that adhesives can be applied to an aluminum tape and even depicts an apparatus for accomplishing this process. DX–16, a technical paper presented to the trade in 1963, notes that the EAA adhesive was available as a resin which could have been applied to the core in a variety of ways. The Mildner '540 patent specifically states that the EAA adhesive could be applied directly to the core, which is how the adhesive ordinarily is applied with respect to swaged cable. See DX–5, Col. 3, lines 48–58, of the Mildner '540 patent for the fact that it can be done and Col. 7, lines 10–16 as to specific means for applying the adhesive.

There is no indication in the evidence that anyone ever had any difficulty in finding ways and means for employing adhesives to bond foam insulation to the outer conductor of a swaged cable. Mr. Masterson observed no such problem in his 1963 memorandum as shown in DX–21. General Cable experienced no such problem when it used an EAA adhesive to manufacture samples of adhesively bonded cable. See DX–60, p. 2 (reference to use of emulsion of "Surlyn," an EAA adhesive); DX–33, p. 3.

**68.**

It is also contended by Trilogy that the disclosure of the Mildner '540 patent should not be used in conjunction with the disclosure of the Garner '330 patent because the Mildner patent does not explicitly state that its disclosure is useful with coaxial cables having foam insulation. Comm Scope replies that the Mildner patent does refer to "coaxial shields," (Col. 1, lines 46–55), and does disclose insulation material consisting of "foamed plastic," (Figs. 2A, 2B; Col. 4, lines 65–70). The Mildner patent states that it "will be evident to those skilled in the art that the improvements of this invention can be obtained by modifying conventional wire and cable constructions ..." Mr. Olszewski, a former employee of General Cable testified in his deposition of December 4, 1987, read into evidence at the trial, that foam dielectric insulations "were known to be highly desirable in at least the beginning of the century," and Mr. Brorein, one of the inventors of the patents in suit, testified in his deposition of March 12, 1987, read at the trial, that swaged coaxial cables having foam polyethylene insulation were conventional in the art at least as early as 1962, before the filing of the original application resulting in the Mildner '540 patent.

**69.**

Trilogy also advances the argument that the claimed invention in the patents in suit brought about improved structural return loss in electrical cables. However, the evidence offered by both sides on this question is contradictory and inconclusive. Mr. Olszewski, an expert who was a contemporary of Mr. Brorein, at General Cable, noted that the evidence relating to structural return loss (SRL) is contradictory and inconclusive. For example, a February 12, 1968, General Cable memorandum reported that "post heating," which is how the inventions alleged in the patents in suit were referred to at General Cable, "does not, on the average, change electrical characteristics of 'cables.'" DX–58, p. 1 ("Coaxials–Qualfoam"). On January 16, 1967, Mr. Brorein wrote a memorandum in which he stated that the heat of jacketing as applied

to commercial Qualfoam cable of the prior art had reduced structural loss. DX–30, p. 6, § 3(f). This memorandum relates to the commercial product, Qualfoam, which was manufactured and sold more than one year before the filing of the earliest of the applications that resulted in the patents in suit. Thus, this memorandum supports results which were achieved and known in the prior art. Comm Scope offered test results at the trial that the heat of jacketing, as applied to the QR and P–III cables produces, on the average, either no change in SRL or increases the loss. DX–153, DX–157 (QR and P–III SRL Test Results).

**70.**

The Court finds that the evidence relative to the alleged reduction in structural return loss brought about by the patents in suit is so inconsistent that it does not support a definitive finding other than that: (1) a reduction in structural return loss was achieved and recognized in the case of jacketed Qualfoam of the prior art, DX–30, p. 6 § 3(f); (2) application of the heat of jacketing to Comm Scope's QR and P–III products does not, on the average, produce a reduction or improvement in structural return loss, DX–153, DX–157; and (3) even if the inventions alleged in the patents in suit did bring about some improvement in the structural return loss, that improvement was expected from the prior art and would not rebut the evidence in the record showing clearly and convincingly that the subject matter claimed in the asserted claims was obvious within the meaning of 35 U.S. C.A. Section 103.

**71.**

A further contention of Trilogy is that a statement made by patent counsel during the prosecution of the application that resulted in Comm Scope's patent on QR (United States Patent No. 4,472,595, see PX–59) is inconsistent with Comm Scope's reliance on the Mildner '540 patent in this litigation. However, Mr. Witherspoon, an expert on Patent Office procedures and practices, testified that Trilogy's contention is erroneous. The statement made by counsel related to the propriety of combining the Mildner '540 patent with the appa-

ratus of the '340 patent at issue here for the purpose of defeating the patentability of the claims on an entirely different patent that is not at issue and that was not applied for until more than a decade after the patents in suit. 5X–59 (Amendment filed July 19, 1982, p. 8). The statement is not inconsistent with Comm Scope's position in this litigation and is essentially immaterial.

### 72.

By way of summary, the Court finds that the invention alleged in the '250 patent in suit amounts to the process of "fusion bonding" a coaxial cable having foam polyolefin insulation, such as prior art Qualfoam, by rapidly heating the cable using high heat followed by quenching of the heat. The invention alleged in the '846 patent is the product of this process. Under the broad definition of "fusion bonding" adopted by Trilogy, the Mildner '540 patent teaches "fusion bonding," as was acknowledged by Trilogy's expert, Dr. Ordway. The problems to which the Mildner '540 patent is directed, such as moisture penetration, relative movement of the cable parts and the need for a cable that is strong mechanically, are largely those encountered with the prior art Qualfoam. Further, the Mildner patent indicates that its disclosure is useful with respect to a wide array of cable products, including coaxial and other cables having "seamless" or "welded sheaths." Under these circumstances, it would have been quite natural for a man of ordinary skill in the art to have used the Mildner disclosure to solve the problems encountered with the prior art Qualfoam—in effect, to have bonded the foam of Qualfoam type coaxial cable made in accord with the '330 Garner patent to the outer conductor, using EAA adhesive. Under Trilogy's broad definition of "fusion bonding," the combination of the Garner '330 patent and Mildner '540 patent would include or produce every element and every step set forth in the asserted claims of the '846 and '250 patents in suit, rendering these claims invalid under 35 U.S.C.A. Section 103.

### J. Obviousness in Light of Prior Art Jacketed Qualfoam

### 73.

The evidence shows that jacketed Qualfoam which was made and sold by General Cable at least as early as 1965 entailed the manufacture of regular Qualfoam in accord with the Garner '330 patent followed by extrusion of a polyethylene jacket over the exterior surface of the outer conductor, which therefore entailed application to the cable of the heat of jacketing. The obviousness of the inventions claimed in the patents in suit, within the meaning of 35 U.S.C.A. Section 103, is also indicated by Mr. Brorein's appreciation and report of the effect the jacketing process on jacketed Qualfoam. He acknowledged that this heat treatment relaxed some of the compression exerted on the foam by the swaging process, softened the foam and caused the softened foam to fill up some of the larger irregularities (or "crevices") in the outer conductor. Qualfoam coaxial cable that was made by the swaging process was inherently under at least some compression. (See DX–3, Garner '330 patent calling for squeeze of between 5 and 15 mils.) Also see Mr. Brorein's deposition of October 27, 1987, read into evidence at trial.

### 74.

Mr. Brorein reported the results obtained by General Cable's plant in producing Qualfoam in a memorandum dated January 16, 1967, (DX–30). He noted that "The plant has had success in improving cable SRL (structural return loss) by utilizing the heat from the jacketing operation to reduce periodic internal compression points to O.D. (outside diameter) riples in the core or thickness ripples in the aluminum strip." Id., 3(f). While Mr. Brorein noted that additional work was needed in the area his perception and communication related to commercial Qualfoam coaxial cable that was made, jacketed and sold significantly more than a year before the filing of the earliest of the applications that resulted in the patents in suit. The memorandum was dated more than one year prior to the filing of said applications. This product was

therefore a part of the prior art under 35 U.S.C.A. Section 102(b).

The results obtained by General Cable in applying the heat of jacketing to Qualfoam were not accidental or unwitting; rather they were intentional, recognized and communicated to others at least as early as January, 1967. DX–30, § 3(f), reflects this recognition and communication and also notes that General Cable had intended to improve its Qualfoam product by using the heat of jacketing: "The *plant* has had *success* in *improving* cable SRL by utilizing the heat from the jacketing operation ..." (emphasis added). See also the October 27, 1987 deposition of Mr. Brorein.

#### 75.

A man of ordinary skill in the art at the time of the alleged inventions who was informed of the results experienced, appreciated and communicated to the employees of General Cable regarding jacketing Qualfoam would have found it obvious to have increased the temperature or duration of the heat treatment so as to practice "fusion bonding." Increasing the length or duration of the heating step would have been expected to have increased the supposedly beneficial results already obtained and recognized with the relatively low heat of jacketing. In effect Mr. Brorein indicated in his deposition of October 27, 1987 that what he and Mr. Polizzano actually did was to increase the heat.

#### 76.

By way of review it appears that the inventions alleged in the patents in suit entailed no surprising or unexpected results. Mr. Brorein acknowledged that it was already known that polyethylene foam could be bonded to aluminum by means of heat. See, e.g., DX–9 (Lamons '990 patent, Col. 10, lines 1–13; Col. 11, lines 21–36, application filed in 1962, patent issued in 1965). The results referred to in the patents in suit, such as reduction of compression and causing the foam to melt and flow into irregularities in the sheath, are what would have been expected to occur as a result of heating coaxial cable made in accord with the preferred embodiment of the Garner '330 patent in which the

squeeze applied was between 5 and 15 mils. The results obtained and appreciated with respect to the relatively low heat applied in making jacketed Qualfoam of the prior art confirmed these expectations and suggested that greater heat would produce greater results, as in the case of induction heaters as disclosed in the patents in suit. Improvement in structural return loss was not an unexpected or surprising result because jacketed Qualfoam of the prior art had already been recognized as having improved structural return loss. DX–30, § 3(f).

### K. Anticipation of the Claims of the '340 Patent

#### 77.

Claim 1 of the '340 patent appears to read on the apparatus used to jacketed Qualfoam of the prior art. To the extent that this claim may somehow be deemed to read on the apparatus used to manufacture QR, it is anticipated on the further ground that the apparatus used to extrude a polyethylene jacket upon QR cable is essentially the same apparatus previously used to extrude a polyethylene jacket upon "Alumagard" cable made and sold by Superior Cable in 1963. If Claims 2 and 3 of the '340 patent were deemed to read on the apparatus used to extrude a polyethylene jacket upon QR cable, they would also be anticipated by the "Alumagard" apparatus.

### L. Obviousness of the Asserted Claims of the '340 Patent

#### 78.

The three asserted claims of the '340 patent would have been obvious to a man of ordinary skill in the art at the time of the alleged inventions. While the claims call for a heater to supply sufficient heat to accomplish certain recited results, no particular type of heater is required. In addition, the recited results are inherent and unavoidable when coaxial cable having a polyethylene foam dielectric, such as Qualfoam, is heated. A man of ordinary skill in the art who was aware of the Mildner '540 patent, (DX–5), the disclosures of United States patent to Lamons, (DX–9), or

the results obtained and recognized with jacketed Qualfoam of the prior art would have found it obvious to increase the temperature used in making Qualfoam by virtually any conventional heating means, which is all that Claims 1 through 3 of the '340 patent require, as these claims are construed by Trilogy.

79.

Again, the asserted claims of the '340 patent would be obvious to a man of ordinary skill in the art at the time on the basis of United States Patent 3,144,369 to Foord, (DX–13). Every element of the asserted claims of the '340 patent is either disclosed by or inherent in this Foord patent, which is prior art under Section 102(a) and (b). The means for advancing the cable is not described in detail but is directionally indicated by an arrow in Figs. 1 and 2. The "heater station including a heater that raises the sheath to a temperature above the softening and flow temperature of the foam" is indicated as item 6 in Figure 1 and item 7 in Figure 2 of the Foord patent. The fact that the foam is heated to its softening and flowing point—indeed, until it is "fused"—is made clear in Col. 2, line 69 through Col. 3, line 1. The "quenching means" referred to in Claim 3 of the '340 patent are also indicated in the Foord patent which states: "[A]s in the previous example, the cable is cooled to set the expanded structure ..." DX–13, Col. 3, lines 8–9. While the Foord patent does not state that the heater is correlated with the speed of the means for advancing the cable, such a correlation is inherent if, as Trilogy contends, it may be said to be inherent in the apparatus used by Comm Scope to produce QR.

### M. Lack of Meaningful Evidence as to Commercial Success

80.

There is very little evidence in the record as to commercial success attributable to the inventions alleged in the patents in suit, as opposed to other factors, such as Comm Scope's technical and marketing expertise. General Cable practiced "fusion bonding" for about two years before it switched its production to disc coaxial cables that do not embody any of the inventions in the patents in suit. The evidence indicates that it made this change because it experienced technical problems and excessive scrap with Qualfoam that was supposedly fusion bonded. See DX–55, DX–56 (General Cable's memoranda regarding Quality Assurance Tests reporting leakage in "heat bonded" Qualfoam cables made for Lincoln Telephone Co.); DX–62 (noting Brorein's work to reduce waste); DX–79 (noting production of Qualfoam stopped). In an April 30, 1969 memorandum, General Cable's Quality Assurance Personnel reported:

> As a result of a recent study by Mr. Burns, if the Qualfoam product could be produced at 100% efficiency (no scrap), the product would barely break even from a profit viewpoint. Testing and test requirements were found to be the principle factors for this condition.

DX–74, p. 2.

QR and P–III cables made by Comm Scope have been commercially successful but the evidence indicates that this success is attributable to Comm Scope's own developments and marketing. Although QR has superior flexibility, handling ability and electrical performance, these properties are the subject of Comm Scope's own patent, United States Patent No. 4,472,595 (PX–58). P–III was established in the market before adhesive was employed between the foam and the outer conductor of this cable. Regular P–III, which has no adhesive bond between the foam and the outer conductor, has been and remains Comm Scope's best selling trunk coaxial cable product.

### N. Indefiniteness of Claims Directed to "Fusion Bonding" and "Fusion Bonded" Cable

81.

■ The asserted claims of the '250 patent and all of the asserted claims of the '846 patent, except Claims 7 and 8, are indefinite because they refer to "fusion bonding" and "fusion bonded" cable which terms are not adequately defined in the patents. As shown by the conflicting opinions of the experts at trial, the terms mean

different things to different people involved in the art. For example, Mr. Brorein testified that he omitted from the patents any reference to the heat of jacketing because he considered this heat "inadequate" and "not sufficient" to practice "fusion bonding." Yet, in this litigation, Trilogy contends that Comm Scope's application of the heat of jacketing constitutes infringement of the '846 and the '250 patents. Trilogy's expert, Dr. Ordway, made an elaborate diagram illustrating his views of "fusion bonding" and defining its limits (PX–196), but no such diagram is included in the patents. During cross examination Mr. Brorein acknowledged that he did not know how the public could determine when the inventions of the patents in suit were or were not being used.

### 82.

The vagueness inherent in the terms is highlighted by the fact that the equipment that Comm Scope uses to practice what is now said to be "fusion bonding" is essentially the same equipment used by Comm Scope's predecessor, Superior Cable to produce Alumagard coaxial cable in 1963. Although Alumagard cable did not include an adhesive, the EAA adhesive used by Comm Scope to make QR and adhesive P–III was developed by Dow Chemical, not Polizzano or Brorein. What Trilogy now calls "fusion bonding" is nothing more than the use of the Dow Chemical adhesive in the way and for the purpose that Dow Chemical said it should be used. While a patent grant confers upon the grantee a privilege, persons of ordinary skill in the art and others should not be left to guess or wonder at their peril as to when and whether they might be or might not be practicing an alleged invention. Because the asserted claims of the '250 and the '846 patents, (except Claims 7 and 8 of the '846 patent) create this kind of problem, the Court finds that the claims are invalid under 35 U.S. C.A. Section 112 (§§ 1 and 2).

### O. Unenforceability for Violation of Duty of Disclosure and Candor

### 83.

During the prosecution of the applications which resulted in the '846 and '250 patents, the applicants and their counsel were aware of highly material prior art and other information that should have been called to the attention of the Patent Office Examiners. The prior art consisted of the Lamons '990 patent, the application for the Mildner '540 patent and the effects that were obtained and recognized by the heat of jacketing when applied to commercial Qualfoam coaxial cable of the prior art. The other information consisted of internal memoranda received by William Brorein, George Eager, (General Cable's Director of Research), and other General Cable employees indicating that "post heating," as the inventions alleged in the patents in suit was frequently called at General Cable, did not actually produce the results represented in the patents and were needed to solve the problems for which the inventions were allegedly developed.

### 84.

The importance of this information becomes apparent in light of the first Patent Office action on the original application that resulted in the '846 and the '250 patents. The Patent Office Examiner rejected all of the claims that had not been withdrawn pursuant to a telephone conversation with the attorney for the applicants. DX–83 (file history of '846 patent, office action dated 12–8–69, pp. 2–3). Applying the Garner '330 patent (DX–3) as his primary reference, the Examiner stated:

> The only difference between Garner and the instant case is the claim to fusion bonding between the metal sheath and the foam insulation.

*Id.* The Examiner cited three secondary references (Frielink, Vincent, and Tomlinson) that, in his opinion rendered "fusion bonding" of Garner type cable obvious to a man of ordinary skill in the art.

### 85.

The attorney for the applicants later overcame the rejection in the following manner. First, he distinguished the Vincent reference on the grounds that it "is not a

cable" and the Tomlinson reference on the grounds that the existence of any fusion bond was "conjectural," inasmuch as the Tomlinson reference set forth no useful result that could be obtained by heating. DX–83 (file history of '846 patent, amendment dated February 24, 1970, pp. 3–4). The attorney also made the following representation:

Persons skilled in the art would be more likely to believe that application of sufficient heat to melt the foam of the Garner coaxial cable would greatly impair the electrical qualities of the cable and very likely make the insulation qualities of the cable unsymmetrical around the circumference of the insulation, so as to produce, in effect, a coaxial cable that is no longer coaxial.

Id. at 4.

### 86.

The Lamons '990 patent (DX–9) which issued in 1965, specifically disclosed fusion bonding between the aluminum outer sheath of a coaxial cable and the underlying foam polyethylene. DX–9 (Lamons '990 patent, Col. 10, lines 1–13—"fusion of the plastic"; Col. 11, lines 26–37—"by adhesive or by fusion"). A secondary reference containing this information was exactly what the Examiner had been looking for in his action of December 8, 1969, in which he used the Garner '330 patent as a primary reference and stated that the difference between Garner and the case at hand was "the claim to fusion bonding between the metal sheath and the foam insulation." DX–83 (office action of 12–8–69, pp. 2–3). Mr. Witherspoon testified that Lamons was a "missing link" that was highly material to the application that resulted in the '846 and '250 patents in suit.

### 87.

The evidence shows that the attorney for the applicants must have been aware at the time of the February 24, 1970, amendment filed in response to the office action of December 8, 1969, that the Lamons '990 patent specifically disclosed fusion bonding between the metal sheath of a coaxial cable and polyethylene insulation. The Lamons '990 patent had been cited against another General Cable patent application prosecuted by the same attorney, which later became United States Patent No. 3,356,790 (DX–209). In an April 21, 1967, response to the Patent Office action that cited the Lamons '990 patent, the attorney for the applicants in the case at bar stated:

Lamons discloses several plans for holding the sheath against relative movement on the cable insulation at the longitudinally spaced locations. In Figures 1, 2 and 3, the compression of the insulation at the bottoms of the corrugations is used to clamp the confronting faces of the sheath and insulation together with sufficient force to prevent slippage. *In Figures 5 and 6 the insulation is bonded to the sheath at the spaced locations. This can be done with heat if the insulation is thermoplastic.*

DX–230 (extract of file history of United States Patent No. 3,356,790, amendment filed April 21, 1967, p. 4) (emphasis added).

### 88.

Defendants' Exhibit No. 64, a memorandum written by William J. Brorein, one of the inventors of the patents in suit, on February 9, 1969, to Dr. Eager and Mr. Jachimowicz of General Cable while each of the applications for the patents in suit was pending discloses a continuing awareness of both Mr. Brorein and the attorney of the Lamons '990 patent. In this memorandum, Mr. Brorein reported on various patents that "have been gathered at Mr. Neill's (the attorney) office for review." The Lamons '990 patent (DX–9) was included (see page numbered "H10432").

### 89.

The failure of the attorney for the applicants to call the fusion bonding disclosure of the Lamons '990 patent to the attention of the Patent Office Examiner who had principal responsibility for the original application that resulted in the '846 and the '250 patents in suit, under the circumstances shown by the evidence was either intentional or grossly negligent. The evidence shows that the attorney was aware not only that Lamons taught fusion bonding of a metallic sheath to foam insulation

but that Lamons undercut the representations made by him to the Examiner in order to overcome the rejection. For example, it was not "conjectural" in Lamons as to whether fusion bonding occurred as he said of Tomlinson. Lamons *did* relate to a cable, which the attorney said was untrue of Vincent. Further, Lamons specifically pointed up the benefits of heating a cable having polyethylene foam and *dispelled* the argument made by the attorney about Frielink, that persons of ordinary skill in the art would have thought that heating the foam to its melting point could have impaired the electrical qualities of the cable and resulted in "a coaxial cable that was no longer coaxial."

90.

The Court is of the opinion that, had the Lamons '990 patent been called to the attention of the Patent Office Examiner following the office action of December 8, 1969, the claims of the patents would not have been allowed, at least not in their present forms.

91.

The Court finds that the failure of the attorney for the applicants to call the Lamons disclosure about fusion bonding of the aluminum sheath of a coaxial cable to foam polyethylene insulation, coupled with his representations about supposed deficiencies in the art cited by the Examiner—deficiencies which would have been overcome by Lamons—constituted a breach of the duties of candor and disclosure, rendering the '846 and the '250 patents unenforceable.

P. *Failure to Disclose Effects Obtained and Recognized with Jacketed Qualfoam of the Prior Art*

92.

The '846 and '250 patents in suit emphasize certain results achieved by "fusion bonding." Among these are relaxation of the compression upon the foam, causing the foam to flow into irregularities in the underside of the sheath and improvement in structural return loss. These results are set forth in the specifications of all three of the patents in suit and were emphasized by representations made by the attorney for the applicants, during prosecution of the original application which resulted in the '846 and '250 patents. DX–83 (file history of '846 patent, amendment dated February 24, 1970, pp. 2–3).

93.

In his deposition of October 27, 1987, read into evidence at the trial, Mr. Brorein acknowledged that these results were obtained to some extent with jacketed Qualfoam of the prior art. Mr. Brorein also acknowledged sending a memorandum to his co-workers more than a year before the filing of the earliest of the applications for the patents in suit in which he recognized that the heat of jacketing had caused relaxation of compression exerted on the foam during swaging and improvement in structural return loss. DX–30, § 3(f), dated January 1967.

94.

At trial, two former members of the Board of Patent Appeals, Mr. Witherspoon and Mr. Modance, stated that the results that were achieved and recognized with respect to jacketed Qualfoam at least as early as January, 1967, were material to the applications for the patents in suit in that a reasonable examiner would have wanted to have known about the results before permitting the applications for the patents to issue. In Mr. Witherspoon's opinion, this prior art was very material.

95.

Mr. Brorein testified at trial that the patent attorney for General Cable, who was the attorney representing the applicants during the prosecution of the applications for the patents in suit was informed about jacketed Qualfoam of the prior art and the results achieved with the product. The attorney's emphasis, in both the specifications of the patents in suit and the amendment filed on February 24, 1970, on the results supposedly achieved by fusion bonding, coupled with his simultaneous failure to inform the Patent Office Examiner about similar results obtained and recognized with jacketed Qualfoam in the prior art, was either intentional or grossly negli-

gent. The jacketed Qualfoam product was highly material and the results obtained and recognized with respect to it indicated that additional heat would produce similar but greater results. In fact, the application of greater heat to the cable than the heat of jacketing is what Mr. Brorein testified that he and Mr. Polizzano did in making their alleged inventions. See Brorein's deposition, October 27, 1987, (read into evidence at the trial).

### 96.

The failure to call these matters to the attention of the Examiner who had principal responsibility for the application that resulted in the '250 patent amounted to an additional violation of the duty of candor and disclosure because the claims of the '250 patent emphasize some of the results that Mr. Brorein and other employees of General Cable knew were obtained by applying the heat of jacketing to the prior art Qualfoam. For example, Claim 1 of the '250 patent contains a limitation to "relieving the pressure" in the foam ... "by heating the sheath." Claim 2 contains a limitation directed to "causing the insulation to fill any irregularities in the inner surface of the sheath by heating the insulation ..." Claim 3 contains a limitation directed to quickly heating and then rapidly cooling the cable. Similarly, Claim 13 is limited to heating the metal sheath of a cable to a temperature, "that softens the outside of the foamed insulation to relieve compression ..." All of these results occurred to some extent with jacketed Qualfoam of the prior art, and these results were known and appreciated by Mr. Brorein and communicated to others at General Cable.

### 97.

Failure to inform the Examiner who had principal responsibility for the application that resulted in the '340 patent also amounted to a violation of the duty of disclosure and candor. The only prior art that the Examiner cited against this application was the Garner '330 patent (DX–3). If the Examiner had been informed that jacketed Qualfoam had also been manufactured in the prior art and that the heat of jacketing had caused the compression on the foam partly to relax and the foam to soften and flow thereby filling up at least the larger irregularities in the sheath, the Examiner almost certainly would not have permitted Claim 1 of the '340 patent to issue. A reasonable examiner, who was aware of the cable described in the Garner patent and who was examining claims in a pending application directed to an apparatus for heating that cable clearly would have wanted to have been informed that heat had already been applied to cable of this type in the prior art, and that this heat had produced at least some of the effects referred to in the claims of the pending application. The iniquity of this failure is underscored by Trilogy's present assertion of Claims 1–3 of the '340 patent against an apparatus for applying the heat of jacketing—the very type of apparatus that was not disclosed to the Examiner who had the principal responsibility for the '340 patent application.

### 98.

The attorney's failure, under these circumstances, to call the Patent Office Examiner's attention to the recognized results obtained by applying the heat of jacketing to Qualfoam of the prior art constituted a violation of the duties of disclosure and candor, rendering all of the patents in suit unenforceable.

### Q. Failure to Inform Patent Office Examiner of Internal Memoranda and Unfavorable Test Results

### 99.

The specifications of the '846 and '250 patents in suit contain the following representations:

> The outer layer of the foam-insulated core, when melted by the application of heat to the metallic sheath, flows on to the inner side of the sheath and fills any irregularities in the sheath, and when cooled it provides a bond of high strength to the sheath as well as providing a hermetic seal. With typical, commercially available foamed cellular polyethylene materials, this bond is of such high strength that the foamed material

itself must be torn apart when it is pulled away from the metallic sheath.

These heat-treated cables, by virtue of the intimate bond between sheath and insulated core, are hermetically sealed against longitudinal leakage, whereas, untreated cables will form water and air channels at very low pressures. Heat-treated cables have been tested up to 30 P.S.I. (gauge) air pressure with no leakage, whereas, untreated cables leak at less than 1 P.S.I. (gauge).

DX–6 ('846 patent), Col. 2, lines 3–20; DX–7 ('250 patent), Col. 2, lines 25–42. These representations are sharply contradicted by internal General Cable memoranda and a formal research report generated in 1968, the same year that the applications that resulted in the patents in suit were filed. This report and most of the internal memoranda were sent to Mr. Brorein. The report related to work *done in part* by Mr. Brorein's co-inventor, Mr. Polizzano.

### 100.

In early 1968, General Cable's Quality Assurance Department acknowledged that significant amounts of the "heat bonded" Qualfoam cable manufactured for Lincoln Telephone Company, a customer of General Cable, leaked. DX–55, DX–56, DX–57.

### 101.

A research memorandum dated *March 8, 1968* from George Eager, General Cable's Director of Research, to various research workers, including Mr. Brorein, relating to "post-heating" contained the following notation:

> Blocking of water channel in Qualfoam cable proved to be uncertain with time and moisture and a very intensive investigation is being carried out to utilize knowledge obtained from observations for a positive solution of the processing problem. We expect results in March.

DX–59, p. 2 ("Coaxial–Qualfoam").

On March 29, 1968, the following statement appeared in the minutes of a General Cable Research Committee meeting for the Communications Department:

> For Lincoln, Nebraska, we introduced post heating to provide blocking of water passages. However, *the foam delaminates from sheath when water is admitted.*

DX–60, p. 2 ("Qualfoam," § 2) (emphasis added).

### 102.

In a May 10, 1968, report relating to achievements of the Communications Department in April, 1968, Dr. Eager stated:

> *Adhesion of foamed core to aluminum sheath after post-heating is unstable. Cable core delaminates in presence of water.* A successful experiment was run using emulsion of adhesive copolymer Surlyn (DuPont). Surlyn provides a permanent bond with aluminum and cable core.

DX–92, p. 2 ("Coaxials") (emphasis added).

Then again, Dr. Eager noted in a research memorandum dated *August 9, 1968* to various members of the Research Department that the water migration problem had been solved simply by increasing the compression applied during swaging. He stated:

> Report on application of Surlyn to prevent delamination especially when Yoder mill will be installed, has been issued. Application of Surlyn will not be necessary for standard Qualfoam since it was established that cores can be compressed at sheathing up to 15 mils.

DX–62, p. 2 ("Coaxial Cables").

### 103.

A formal report relating to extensive tests conducted by four General Cable research workers, including, F.F. Polizzano, a named inventor, and approved by Dr. Eager, was made on *September 4, 1968.* The mission of the research and tests was: "To investigate observation of loss of bond in post-heated Qualfoam cables and, if so, to recommend a remedy." The report was designated as "General Cable Research Report 14798," and the following findings were set forth under "Discussion" on page 2:

It has been brought to the attention of the Laboratory (see reference 1) that the *post-heated Qualfoam cables lose the bond between the core and the aluminum outer conductor, if the cable ends are exposed to water or moisture.* The observation was made on 2 ft. long samples that were used for pressure tests. *This report was investigated and it was found to be correct*—see Tables I and II in the Appendix—*the adhesion bond produced by 600° F induction heating is lost in presence of water.* Based on tests that were performed, it appears that the *mechanism of failure* is as follows:

Induction heating causes the gas bubbles in the insulation, next to heated aluminum tube, to expand and so the polyethylene is forced against the inside wall of aluminum. It melts and sticks to aluminum. When the cable is quenched with water and cools down to room temperature, the core tends to shrink away from aluminum and whatever bond that was produced is now under radial stress. *The water apparently attacks this bond* and the core shrinks towards the cable center. *Once half or more of circumference is delaminated the stresses are relieved and the remainder sticks well. The water channel, however, is introduced through which water tends to travel by capillary action. The roughened surface of the core by the post heating appears to aid the capillary travel of water.* (Note that once the stresses are relieved by longitudinal cut of the cable—last sample in Table II delamination does not take place).

*In view of the above findings a new approach to the problem of water leakage is necessary.*

DX–33, p. 2 (emphasis added).

Noting that post heating had been adopted in part to avoid applying a tight squeeze to the cable that might increase structural return loss, the report went on to state:

The above described manufacturing practice was based on Tampa plant claims that high squeeze gives enormous SRL problems. In March, RL # 3445 was placed by the Laboratory calling for higher degree of squeeze or core compression and it was found that plant beliefs were erroneous. *The cables are now manufactured with high compression,* i.e., 412 "core O.D. is 0.370" or 8 mils. compression, *since it was established with certainty that SRL values are uneffected* [sic]. *These developments eliminate water leakage problems and make post heating unnecessary.*

*Id.,* p. 3 (emphasis added).

104.

Mr. Brorein admitted that he received a copy of Research Report 14798 but stated that he took exception to some of the statements contained in the report. However, the evidence reveals that his co-inventor, Mr. Polizzano, not only did not take issue with the report but that the report relates to tests which he helped to perform. Mr. Asdourian, a former employee of General Cable, testified at trial that he had objected to the report because it casts the plant at Tampa, which he managed, in an unfavorable light. Eventually, the original report was revised and reissued in the form of PX–164, bearing the same date as DX–33. However, PX–164 actually repeats much of the same analysis set forth in DX–33. Additionally, PX–164, which also bears the name of F.F. Polizzano, a named inventor, and which was approved by Dr. Eager, General Cable's Director of Research, states that:

The post-heating was applied to cables which had low level of tightness of cable core in the aluminum tube (cable core was compressed 3 mils). *The diameter of cores was increased so that compression of core became 8 mils and this provided sufficient tightness against water leaks so that post heating was dropped.*

PX–164, p. 2 (emphasis added).

105.

While the revised version of the Research Report 14798 did not criticise the manufacturing plant at Tampa which

aroused Mr. Asdourian's objections, the technical analysis set forth was very similar to that set forth in the original report. Both reports noted that post heated cable could leak water and that, far from producing a moisture seal, the bond produced by post heating without an adhesive was temporary and was lost in the presence of water. These statements are inconsistent with the representations made in the specifications and prosecution histories of the '846 and '250 patents, which referred to the "hermetic seal" allegedly produced by post heating, and stated that commercially available foamed polyethylene materials:

> [W]ill bond with no extra adhesive materials, to clean copper, aluminum or steel, if the temperature of the sheath is raised to about 300° F to 850° F for up to 10 seconds and is quickly quenched ...

DX–6 ('846 patent), Col. 3, lines 46–54; DX–7 ('250 patent), Col. 4, lines 21–27.

Additionally, the representation in the specifications of the '846 and '250 patents that "[h]eat treated cables have been tested up to 30 P.S.I. (gauge) air pressure with no leakage, whereas untreated cables leak at less than 1 P.S.I. (gauge)" was incomplete and materially misleading, as demonstrated by either DX–33 or PX–164.

### 106.

The employees of General Cable involved in the evaluation of post heated Qualfoam cables and the tests referred to in Research Report 14798 included many of the employees who were most knowledgeable about Qualfoam coaxial cables, such as Mr. Polizzano and Mr. Brorein, the inventors shown in the patents in suit. In addition, all of the Research Department memoranda as well as Research Report 14798 were approved by Dr. Eager, Director of Research for General Cable, and this report related to tests conducted by Mr. Polizzano, a co-inventor. This report and memoranda demonstrate that several of the representations made in the '846 and '250 patents were not true or were incomplete and materially misleading.

Mr. Brorein, a co-inventor, acknowledged that this report and the memoranda would not have helped his efforts to obtain a patent and that he did not provide a copy of it to the attorney handling the patent application. He also admitted that, in February, 1970, he was aware that the attorney was making representations to the Patent Office Examiner that were inconsistent with Research Report 14798 and that he did not call these matters to the attorney's attention. (See deposition of Mr. Brorein of October 28, 1987 and March 13, 1987—read into evidence at trial.)

### 107.

The incomplete technical data and representations set forth in the specifications and file history of the '846 and '250 patents about the strength of the bond formed between polyethylene foam and aluminum and the creation of a "hermetic seal," coupled with the failure to inform the Examiner of the contents of the 1968 research of General Cable and the Research Report 14798, constituted a breach of the duties of disclosure and candor rendering the patents unenforceable. The memoranda and report were highly material to the applications. They would have corrected erroneous impressions given to the Examiner and may well have resulted in denial of the pending claims. Both Mr. Brorein and Mr. Polizzano had knowledge of the memoranda and report and had been active in the tests and research. The failure to disclose this information was either intentional or grossly negligent.

### R. Failure to Call the Prior Art Mildner Work to the Attention of the Examiner

### 108.

Mr. Brorein as well as all the key research personnel at General Cable were aware of the EAA adhesive developed by Dow Chemical Company before the inventions alleged in the patents in suit. See, e.g., DX–86 (United States Patent 3,183,300) issued to General Cable pursuant to a 1963 patent application specifically referring to Dow Chemical's EAA adhesive by name, (Col. 3, lines 26–31). The evidence at trial established that General Cable's research workers including Mr. Brorein attended meetings with Dow Chemical per-

sonnel where the Dow Chemical EAA adhesive and its uses were discussed.

### 109.

The patent attorney, who handled the applications which resulted in the patents in suit, had detailed knowledge of the filings and contents of the applications which resulted in the Mildner '540 patent. The evidence disclosed that the attorney or his firm had represented General Cable and a Mr. Ludwig Jachimowicz in Patent Interference No. 96,081 (DX–113), which interference was between some of the claims of Jachimowicz United States Patent 3,233,-036 (PX–60–A) and some of the pending claims of the application that resulted in the Mildner '540 patent. See DX–232 (file history of Mildner '540 patent). During the course of the interference, the attorney, was given access to the Mildner application as well as a 1961 disclosure document that described the EAA adhesive developed by Mildner. See DX–229, §§ 8, 12–14; and 1961 Mildner "Disclosure of Invention to Patent Department" included in DX–229. The patent attorney is bound to have known that the invention made by Mildner had not been abandoned, suppressed or concealed, and that it was made in this country long before the inventions alleged in the applications for the patents in suit.

### 110.

At trial, Mr. Modance, a former member of the Board of Patent Interferences who testified on behalf of Trilogy, acknowledged, in effect, that an application such as the Mildner application would likely be prior art under 35 U.S.C.A. Section 102(g), and that the interference and the pending Mildner application should have been called to the attention of the Examiners who had principal responsibility for the applications which resulted in the '846 and '250 patents in suit.

### 111.

The application which resulted in the '540 Mildner patent was more pertinent and comprehensive than the French Dow Chemical patent cited by the Examiner in the application that resulted in the '846 patent in suit for several reasons. The Mildner '540 patent anticipated two of the claims of the '846 patent. Further the application which resulted in the '540 patent specifically noted that conventional cable construction could be modified using the concepts set forth in the application, and the text of its specification specifically referred to "coaxial metal shields." The '540 application also stated that the EAA adhesive could be applied to the core rather than simply to the outer conductor tape. Col. 3, lines 48–58. These statements were pertinent to swaged coaxial cable such as that made in accord with the Garner '330 patent (DX–3), but they were absent from the French text of the French Dow Chemical patent.

### 112.

The attorney for the applicants was aware that the Examiner with respect to the application which resulted in the '846 patent had cited the French Dow Chemical patent for nothing more than the disclosure, in one of the drawings, of a cable having foam insulation and more than one interior conductor. DX–83 (office action dated 12–8–69, p. 3, § 17). Given the attorney's detailed knowledge of the application that resulted in the Mildner '540 patent and its very high degree of materiality to the application that resulted in the '846 patent, his failure to call that application and its disclosure to the attention of the Examiner constituted a violation of the duties of candor and disclosure rendering the '846 and '250 patents unenforceable. Under the circumstances his failure can only be deemed to have been either intentional or grossly negligent.

### S. Alternative Findings Relating to Damages

### 113.

There were non-infringing coaxial cable alternatives to the inventions alleged in the patents in suit. These products include regular "P–III" manufactured and sold by Comm Scope as well as "GID III" products manufactured and sold by other companies, such as Times Fiber Communications, Capscan and Scientific Atlanta Corp. Some of these products competed for sales with MC2 and QR type cables. Other alterna-

tives included "Sealmetic" type coaxial cable and disc type cable, such as MC2, which is made and sold by Trilogy itself. Trilogy has not made or sold any cables in accord with the patents asserted in this litigation (DX–142).

114.

The President of Trilogy has testified that GID–III type cable can be made such that its electrical transmission properties are identical to those of MC2. DX–263 (extracts from Stephen Hallock deposition). At least one witness pointed out that regular (unbonded) P–III and QR can be coupled together by suitable connectors and that they have been used interchangeable in the same cable networks and distribution systems.

115.

In some instances, Comm Scope submitted bids to some cable operators for both regular P–III and QR.

116.

Trilogy lacked the capacity to supply the cable needs of those customers that bought QR coaxial cable. Shinn Lee, Trilogy's Chief Financial Officer, admitted that the company sold all the products it had produced and that it suffered, at various times, from a lack of capacity. DX–261 (extracts from Shinn Lee deposition). John Kaye, another of Trilogy's officers, gave similar testimony. DX–262 (extracts of John Kaye deposition).

117.

The evidence indicates that some of the sales Trilogy claims to have lost to Comm Scope's QR product were actually caused by the dislikes of various customers for disc type cable. For example, Stephen Hallock acknowledged in a written memorandum that MC2 had been rejected by one large customer because the customer had an adverse reaction to an earlier incident involving disc type cable (DX–139). It was not likely that this customer would have purchased disc type cable such as MC2, as opposed to foam type cable; such as QR and P–III.

118.

While there is evidence in the record that reflects Comm Scope's gross profit margin on QR and adhesive P–III cable, Trilogy has presented no evidence apportioning Comm Scope's profits between the allegedly infringing subject matter and other factors, such as Comm Scope's own QR patent and Comm Scope's marketing and technical expertise.

119.

The evidence shows that in the electrical cable business, volumes are high; thus, what may appear to be a low royalty rate will nevertheless produce a substantial return.

120.

The most compelling evidence presented as to what constitutes a reasonable royalty in the electrical cable business was the testimony of Stan Rosen, an executive with American Telephone & Telegraph Co. (AT & T). He testified that he had been engaged in licensing coaxial and other electrical cable patents for a large part of his working life and that a reasonable royalty is .75% of gross sales of the product in question. His testimony was based on his actual experience in licensing electrical cable patents on behalf of AT & T. In some of these transactions, AT & T was licensor, in others, AT & T was licensee. He testified that the practice in the trade was to license all cable patents for a flat royalty of .75% of sales of cable to which the patents are applicable.

121.

At the trial Trilogy argued that a royalty rate of .75% is too low because it was adopted by AT & T as a result of an antitrust consent decree. However, the evidence showed that AT & T had adopted the .75% rate before the consent decree. Mr. Rosen testified that the terms of the consent decree merely require that the terms of any license be reasonable. The Court finds that the standard .75% royalty rate is fair and reasonable under the circumstances of this case.

122.

The Court has determined that Trilogy is not entitled to recover any damages in this action; however, if Trilogy were deemed to be entitled to recover damages, the Court would calculate its damages at .75% of gross sales of the allegedly infringing products sold by Comm Scope during the lives of the patents in suit.

*T. Lack of Wilful or Wanton Infringement and Lack of any Liability as to Additional Defendants*

123.

 There is no evidence that Comm Scope acted in any way other than responsibly and in good faith in deciding to manufacture and sell QR and adhesive P–III products. Comm Scope had investigated the art in the course of applying for its own patent on QR. Before it commercialized its QR product, it already had an opinion from a respectable patent attorney that the patents in suit were invalid and that QR and the method and apparatus used to produce QR would not infringe these patents. When General Cable accused QR of infringing, Comm Scope again consulted its counsel and obtained additional written and oral opinions, based on further study of the patents and the prior art that the patents in suit were invalid and unenforceable. Indeed, the Mildner '540 patent is sufficient by itself to give rise to a genuine belief, which Comm Scope in fact had, that the patents in suit were invalid or unenforceable.

124.

 There is no evidence that any Defendant other than Comm Scope has made, used or sold any product, method or apparatus alleged to infringe any of the claims of the patents in suit. Similarly, while some of the other Defendants did own stock in Comm Scope at various times, there is no evidence that any of these Defendants used Comm Scope as an agent or instrumentality or that Comm Scope was somehow an alter ego of any of these Defendants. Accordingly, there is no evidence that would permit piercing of the corporate veil or a finding of liability on the part of any of the other Defendants.

*U. Expenses and Attorney Fees*

125.

 Trilogy contends that it is entitled to a recovery of attorney fees because this is allegedly an "exceptional case" within the meaning of 35 U.S.C.A. Section 284. Both sides accuse each other of protracted discovery, engaging in deliberate delays and other wrongdoings. None of these arguments have convinced the Court that this is an exceptional case within the meaning of Section 284. Therefore the Court will not enter an order allowing attorney fees in this case.

*V. Summary*

For the foregoing reasons, the Court finds that the asserted claims of all the patents in suit are invalid, unenforceable and not infringed, and that Trilogy is not entitled to recover any damages or other relief. Alternatively, assuming *arguendo* that any of the asserted claims of the patents in suit are valid, enforceable and infringed, Trilogy would be entitled to a recovery based on a royalty of .75% of gross sales of QR and adhesive P–III products sold by Comm Scope during the lives of the patents. No Defendant other than Comm Scope is liable for any act of alleged infringement, and that Comm Scope's alleged infringement has not been wilful, wanton or in bad faith so as to justify multiple damages or an award of attorney fees. The Defendants have moved for a portion of their expenses and attorney fees and such motion is denied.

CONCLUSIONS OF LAW

*A. Jurisdiction and Venue*

1.

This Court has subject matter jurisdiction of this matter under the provisions of 35 U.S.C.A. Section 281 and 28 U.S.C.A. Section 1338(a). The Plaintiff, Trilogy, instituted this action thereby submitting to the in personam jurisdiction of this Court. Comm Scope's residence is in this district

and M/A–Com, Cable Home Communications, and General Instrument have submitted to the in personam jurisdiction of this Court. None of the parties dispute the jurisdiction of this Court.

### 2.

Venue is proper in this Court because it is alleged that Com Scope committed acts of patent infringement in this district. 28 U.S.C.A. Section 1400(b). The parties do not dispute that this district is the proper venue for this litigation.

### B. Burden of Proof

### 3.

Trilogy alleges that Comm Scope directly infringed Claims 1, 2, 3, 6, 7 and 8 of the '846 patent; Claims 1, 2, 3, 4, 6, 8 and 13 of the '250 patent and Claims 1, 2 and 3 of the '340 patent. Therefore, Trilogy has the burden of proving infringement by a preponderance of the evidence. *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1282, 230 U.S.P.Q. 45, 46 (Fed.Cir.1986).

### 4.

Comm Scope denies infringement and by way of counterclaim seeks a declaratory judgment of invalidity, unenforceability and non-infringement. Under the provisions of 35 U.S.C.A. Section 282 the patents in suit are presumed valid and Comm Scope has the burden of demonstrating by clear and convincing evidence that the patent claims at issue are invalid. On the issue of unenforceability Comm Scope has the burden of showing by clear and convincing evidence that the inventors of the patents in suit and/or other individuals having significant involvement in the preparation, and prosecution of the patent applications resulting in the issuance of the patents in suit failed to meet their duties of disclosure and candor, so as to render the patents unenforceable.

### C. Infringement

### 5.

██ In order to determine whether or not the Defendants have directly infringed the claims of the patents in suit, a two-step analysis is required. The Court must (1) first determine the scope of the claims of the patents as a matter of law and (2) thereafter, apply the properly interpreted claims to the accused product to ascertain whether the claims have been infringed. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578, 6 U.S.P.Q.2d 1557, 1559 (Fed.Cir.1988). In applying the requisite two-step analysis to determine whether or not the Defendants have infringed the patents, the focus must be on the individual claim elements of the asserted claims rather than the invention as a whole. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 933–934, 4 U.S.P.Q.2d 1737, 1739–1740 (Fed.Cir.1987). Each element of each claim asserted against the Defendants is material and essential. *Perkin–Elmer Corp. v. Westinghouse Electric Corp.,* 822 F.2d 1528, 1532–33, 3 U.S.P.Q.2d 1321, 1324 (Fed.Cir.1987).

### 6.

██ In order to show that the Defendants literally infringed the patents in suit, Trilogy must show the presence of every element of the asserted claims in Comm Scope's QR and adhesive P–III products and the method and apparatus used to manufacture the QR and adhesive P–III products. *Builders Concrete, Inc. v. Bremerton Concrete Products,* 757 F.2d 255, 257, 225 U.S.P.Q. 240, 241 (Fed.Cir. 1985). If there is even one claimed element or step that is omitted in the accused method, apparatus or device, there is no infringement. Moreover, literal infringement is not a matter of forcing the language of a claim to read upon the accused method, product or apparatus. Even if the claims of a patent literally read on an accused device there is no infringement unless there is real identity of means, operation and result. *Union Water–Meter Co. v. Desper,* 101 U.S. 332, 335, 25 L.Ed. 1024 (1880) and *ZMI Corp., supra,* 844 F.2d at 1578 and 1582, 6 U.S.P.Q.2d at 1562 and 1566 (Fed.Cir.1988). As stated by the Court of Claims in *Autogiro Company of America v. United States,* 384 F.2d 391, 399–400, 181 Ct.Cl. 55, 155 U.S.P.Q. 697, 704 (1967):

If the claims read literally on the accused structures, an initial hurdle in the test for infringement has been cleared. The race is not over; it has *only started....*
[S]ince the law is to benefit the inventor's genius, and not the scrivener's talents, claims *must not only read literally* on the accused structures, *but also* the structures must *"do the same work in substantially the same way and accomplish substantially the same result."*

7.

In addition to Trilogy's claim of literal infringement it also claims that the Defendants have infringed the patents under the doctrine of equivalents. This doctrine provides that patent infringement may be found if the accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention. *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d at 934, 4 U.S.P.Q.2d at 1739 (Fed.Cir. 1987).

The doctrine of equivalents may be useful to both the patentee and the infringer. In *Graver Tank and Mfg. Co. v. Linde Air Prods.,* 339 U.S. 605, 608–609, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 330 (1950), the Supreme Court described the doctrine of equivalents as follows:

The essence of the doctrine is that one may not practice a fraud on a patent.... [A] Patentee may invoke this doctrine to proceed against the producer of a device "if it performs essentially the same function in substantially the same way to obtain the same result" ... The wholesome realism of this doctrine is not always applied in favor of the patentee, but is sometimes used against him. Thus, where a device is so far changed in principal from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and

defeat the patentee's action for infringement.

The Federal Circuit Court of Appeals has recognized that the proper application of the doctrine of equivalents can compel a finding of no infringement, even where the asserted claims "read on" an accused device. In *Texas Instruments, Inc. v. U.S. Intern. Trade Com'n,* 846 F.2d 1369, 1372, 6 U.S.P.Q.2d 1886, 1889 (Fed.Cir.1988), the Court stated that the doctrine of equivalents

is invoked when claims are written more broadly than disclosure warrants. The purpose of restricting the scope of such claim is not only to avoid a holding of infringement when the court deems it appropriate, but often is to preserve the validity of claims with respect to their original intended scope.

The apparatus accused of infringing Claims 1, 2 and 3 of the '340 patent has no "heater station including a heater that raises the sheath to a temperature above the softening and flow temperature of the foam" as required by each of these claims. Trilogy's contention that the heat of jacketing is an equivalent of the heater apparatus required by the claims is without merit. In *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d at 934–935, 4 U.S.P.Q.2d at 1739 (Fed.Cir.1987), the Court stated:

[I]nfringement *may* be found, (but not necessarily) if an accused device performs substantially the same overall function or work in substantially the same way, to obtain substantially the same overall result as the claimed invention. That formulation, however, does not mean one can ignore claim limitations. (emphasis added)

More than a century ago, the Supreme Court stated:

The law is well settled by repeated adjudications in this Court and the Circuit Courts of the United States, that there is no infringement of a patent which claims mechanical powers in combination, unless all the parts have been substantially used. The use of a part less than the whole is no infringement.

*Eames v. Godfrey*, 68 U.S. (1 Wall) 78, 79, 17 L.Ed. 547 (1864). Similarly, in *Gould v. Rees*, 82 U.S. (15 Wall) 187, 194, 21 L.Ed. 39 (1872), the Supreme Court said:

> Where the defendant in constructing his machine omits entirely one of the ingredients of the plaintiff's combination without substituting any other, he does not infringe, and if he substitutes another in the place of the one omitted, which is new or which performs a substantially different function, or if it is old, but was not known at the date of the plaintiff's invention as a proper substitute for the omitted ingredient, then he does not infringe.

See also *Perkin–Elmer Corp. v. Westinghouse Elec. Co.*, 822 F.2d at 1532–33, 3 U.S.P.Q.2d at 1325 ("each element of a claim is material and essential ... in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device").

As stated in the Court's findings of fact, the heat of jacketing provides significantly less heat than the heater apparatus referred to in the patents in suit; moreover, an attempt to include the heat of jacketing (or the apparatus by which it is applied) within the "heater" language of Claim 1 of the '340 patent would impermissibly extend the scope of the asserted claims to the prior art. *Compare Carman Inds., Inc. v. Wahl*, 724 F.2d 932, 937, n. 5, 942, 220 U.S.P.Q. 481, 487 (Fed.Cir.1983), (one limitation on doctrine of equivalents is that claim cannot be accorded a construction that could encompass prior art); *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579–80, 220 U.S.P.Q. 1, 6 (Fed. Cir.1983).

### 8.

 In construing the language of the claims of the patents in suit the Court is guided and bound by the appropriate precedents of the Court of Appeals for the Federal Circuit. In the first instance, the Court considers the literal language of the patent claims, *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671, 221 U.S.P.Q. 944, 948 (Fed.Cir.1984). If there is no dispute as to the meaning of the language of the claims, then the Court may interpret their scope as a matter of law. On the other hand, where the meaning of key terms used in the claims are in dispute, extrinsic evidence is resorted to, including the specification of the patent, the prosecution history, the prior art, expert testimony and the other claims in the patent. *Tandon Corp., v. U.S. Inter. Trade Com'n*, 831 F.2d 1017, 1021, 4 U.S.P.Q.2d 1283, 1286 (Fed.Cir. 1987). Another fundamental principal of claim interpretation and infringement analysis is that the claims of the patents in suit cannot be interpreted to include the prior art. *Carman Inds.*, 724 F.2d 932, 937, n. 5, 942, 220 U.S.P.Q. 481, 485, n. 5 (Fed.Cir.1983). If the claims of the patents in suit cover prior art, then the claims are invalid. The claims of a patent should be interpreted to preserve the validity of the claims, even if that interpretation leads to a finding of no infringement. However, patent claims must be construed in the same way for infringement that they were interpreted for determining validity. *Smithkline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 882, 8 U.S.P. Q.2d 1468, 1471 (Fed.Cir.1988).

### 9.

In construing the language of the claims of the patents in suit asserted by Trilogy, it is appropriate, certainly at the outset, to ascribe the ordinary English language meaning to each of the words used therein. *In re Hyatt*, 708 F.2d 712, 218 U.S.P.Q. 195, 197 (Fed.Cir.1983). In this case, the readability of some of the language of some of the asserted claims on Comm Scope's QR and adhesive P–III products and the method and apparatus used to manufacture these products is not in dispute. However, there is a significant dispute as to whether the language in the asserted claims requiring a "fusion bond" between the outer conductor and foamed insulation reads on Comm Scope's QR and adhesive P–III products and whether the method and apparatus employed by Comm Scope in the manufacture of the QR and adhesive P–III products "fuses" the foam to the outer conductor.

**506**

### 10.

For the reasons set forth in the findings of fact, the Court concludes that Comm Scope's products QR and adhesive P–III and the method and apparatus used by Comm Scope to make these products have not infringed any of the asserted claims of the patents in suit, other than Claims 7 and 8 of the '846 patent, which claims the Court has determined to be invalid. Comm Scope is not practicing "fusion bonding" and is not producing "fusion bonded" cable as these terms are used in the patents in suit. Rather, QR and adhesive P–III are cables made using the relatively low heat of jacketing to activate an adhesive of the prior art in a way and for a purpose that was already known in the art. The prior art prohibits giving the terms "fusion bonding," "fusion bonded" and "fused" the broad definition (essentially bonding with a heat activated adhesive) that Trilogy seeks to have the Court adopt.

### 11.

The Court further concludes that any suggestion by Trilogy that the abstract of the '846 patent in suit should be used to define the meaning of "fusion bonding" or "fusion bonded" as set forth in the claims, is misplaced. According to the rules and regulations of the Patent and Trademark Office, the abstract is not to be used to interpret claims. 37 C.R.F. § 1.72(b), which relates to patent applications, provides:

> A brief abstract of the technical disclosure in the specification must be set forth on a separate sheet, preferably following the claims under the heading "Abstract of the Disclosure." The purpose of the abstract is to enable the Patent and Trademark Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure. *The abstract shall not be used for interpreting the scope of the claims.* (emphasis added)

### 12.

 Trilogy also contends that Comm Scope's QR an adhesive P–III products and the method and apparatus used in the manufacture thereof perform substantially the same function in substantially the same way to obtain the same result as the inventions set forth in the asserted claims and, consequently, that Comm Scope infringes the patents in suit under the doctrine of equivalents. However, the doctrine of equivalents may not be employed so as to encompass the prior art. *Carman Inds., Inc. v. Wahl,* 724 F.2d 932, 937, n. 5, 220 U.S.P.Q. 481, 487 (Fed.Cir.1983). (Limiting application of the doctrine of equivalents as result of the prior art) *Stewart–Warner Corp. v. City of Pontiac, Michigan,* 767 F.2d 1563, 1572, 226 U.S.P.Q. 676, 682 (Fed. Cir.1985). For the reasons set forth in the Court's findings of fact, the use of a heat activated adhesive to adhere the foam insulation to the outer conductor, as practiced by Comm Scope, is not equivalent to "fusion bonding" as claimed in the patents in suit. The Court concludes that Comm Scope's manufacture of its QR an adhesive P–III products does not infringe the asserted claims of the patents in suit by the doctrine of equivalents.

### D. Invalidity
### 13.

Since the Defendants contend that the claims of the patents in suit asserted by Trilogy are invalid under 35 U.S.C.A. Sections 102, 103 and 112 it will be necessary for the Court to analyze the claims in light of each section of the statute.

### (a) 35 U.S.C.A. Section 102

 When a reference discloses every element of the invention of any single patent claim, and otherwise meets the requirements of the different subsections of Section 102, it anticipates the claimed invention and renders the invention invalid. *In re Donohue,* 766 F.2d 531, 534, 226 U.S.P.Q. 618, 621 (Fed.Cir.1985). In making its analysis, the Court must interpret each element of the claims of the patents in the same way it does in connection with the infringement inquiry and must identify corresponding elements disclosed in the anticipating reference. *Smithkline Diagnostics v. Helena Laboratories Corp.,* 859 F.2d

878, 882, 8 U.S.P.Q.2d 1468, 1471 (Fed.Cir. 1988). Anticipation does not require that a single prior art reference teach what the subject patent teaches, it requires only that the prior art reference disclose a device having all the elements of the claimed invention. *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 772, 218 U.S.P.Q. 781, 789 (Fed.Cir.1983). The prior art reference need not expressly disclose each claimed element in order to anticipate the claimed invention. *Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 689, 227 U.S. P.Q. 845, 846–847 (Fed.Cir.1985). Rather, if a claimed element (or elements) is inherit in a prior art reference, then that element (or elements) is disclosed for purpose of finding anticipation. *Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631–633, 2 U.S.P.Q.2d 1051, 1052–1054 (Fed.Cir.1987). If a structure in the prior art necessarily functions in accordance with the limitations of a claim, the claim is anticipated. While all elements of the claimed invention must appear in a single reference, additional references may be used to interpret the anticipating reference and to shed light on its meaning, particularly to those skilled in the art at the relevant time. *Studiengesellschaft Kohle v. Dart Indus., Inc.*, 726 F.2d 724, 726–727, 220 U.S.P.Q. 841, 842–843 (Fed.Cir.1984).

### 14.

Trilogy admits that the Mildner work represented by the Mildner '540 patent is prior art pursuant to 35 U.S.C.A. Sections 102 and 103. The Court concludes that the Mildner '540 patent discloses and describes each of the elements of Claims 7 and 8 of the '846 patent in suit and renders those claims invalid pursuant to 35 U.S.C.A. Section 102(e).

### (b) 35 U.S.C.A. Section 103

### 15.

The issue of obviousness under Section 103 is a question of law based on underlying factual determinations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Court is required to determine the scope and content of the relevant prior art, the differences between the prior art and the claimed subject matter, and the level of ordinary skill in the pertinent field of endeavor. *Graham, supra*, 383 U.S. at 18, 86 S.Ct. at 694. The Court must also consider any evidence of objective indicia of nonobviousness. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1380, 231 U.S.P.Q. 81, 90 (Fed.Cir.1986). Against this background, the ultimate issue of obviousness is determined.

### 16.

The obviousness of the inventions claimed in the patents in suit must be tested as of the time the inventions were made and it is necessary for the Court to cast its mind back to the time the claimed inventions were made. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 5 U.S. P.Q.2d 1434 (Fed.Cir.1988). The hypothetical person of ordinary skill in the art is presumed to know all of the teachings known in the art at the time the alleged inventions were made. In determining obviousness, the person of ordinary skill in the art is pictured as working in his shop with the prior art hanging on the walls around him. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1576, 220 U.S.P.Q. 584, 591 (Fed.Cir.1984). Evidence that others simultaneously developed the inventions of the patents in suit suggests that the inventions of the patents would have been obvious to a person of ordinary skill in the art at the time the inventions were made. *Lerner v. Child Guidance Products, Inc.*, 547 F.2d 29, 31, 193 U.S.P.Q. 329, 330 (2nd Cir.1976).

Prior art references must be evaluated not only for what they explicitly state but for what they teach to a person of ordinary skill in the art. See, e.g., 35 U.S.C.A. Section 103. In addressing the subject of obviousness the relevant prior art should be addressed collectively to determine its teachings as a whole. These principles were recognized in *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898 (Fed.Cir.1985). There is no requirement that the devices or methods disclosed in references be capable of being physically

combined or substituted before the references may be addressed collectively. *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1013, 217 U.S.P.Q. 193, 200 (Fed. Cir.1983).

While the discovery of pertinent prior art references not considered by the Examiner may help in overcoming the presumption of validity, there is no requirement that the reference relied upon by the party challenging the validity of the patent be more pertinent than the art considered by the Examiner. See *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1570, 7 U.S.P.Q.2d 1057, 1065 (Fed.Cir. 1988).

Material that does not technically qualify as prior art may be used as evidence of the level of skill in the art as of the pertinent date. Harmon, Patents and the Federal Circuit, § 4.3(b) at 68 (BNA 1988), citing *In re Merck & Co.*, 800 F.2d 1091, 231 U.S. P.Q. 375 (Fed.Cir.1986).

The Court found as a fact that the production of the jacketed Qualfoam product and the method by which it was produced was not some sort of "accidental" or "unwitting" result but was commercial practice carried out in accord with the "preferred embodiment" of the Garner '330 patent and based upon such finding the Court concludes that it is prior art. The principle set forth in *Tilghman v. Proctor*, 102 U.S. 707, 26 L.Ed. 279 (1881), and *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923), that "accidental and unwitting results do not constitute anticipation" does not apply to the facts established by the evidence in this case.

17.

The difference between the prior art and the claimed inventions are small and insubstantial. The Court concludes that the invention claimed in all of the associated claims of the patents in suit would have been obvious to one of ordinary skill in the art at the time those inventions were made. There is little meaningful evidence of commercial success, long felt need copying or any other secondary consideration. More-

over, even if such evidence did exist, it would not be sufficient to overcome the much more substantial evidence as to obviousness of the inventions alleged in the patents in suit to a person of ordinary skill in the art at the time the inventions were allegedly made.

18.

Even if the results achieved with jacketed Qualfoam were not considered to be prior art, the asserted claims of the patents in suit would be invalid under Section 103 on the basis of the Garner '330 patent (DX–3) combined with either the Mildner '540 patent (DX–5) or the Lamons '990 patent (DX–9).

(c) 35 U.S.C.A. Section 112

19.

Section 112 reads in part:

The specifications shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. The specifications shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

When a patent does not adequately describe and explain how the "invention" is carried out, then the patent is invalid. *White Consolidated Industries, Inc. v. Vega Servo–Control, Inc.*, 713 F.2d 788, 218 U.S.P.Q. 961 (Fed.Cir.1983). The patents in suit do not adequately define the terms "fusion bonding" or "fusion bonded" and do not teach persons of ordinary skill in the art how to distinguish "fusion bonding" from other forms of adhesion. The claims of the '846 patent (except Claims 7 and 8) and the '250 patent as well as Claim 2 of the '340 patent do not particularly point out and distinctly claim the subject matter which constitutes the alleged inven-

tions. All of the claims in all of the patents in suit, except Claims 7 and 8 of the '846 patent have this problem and are invalid under 35 U.S.C.A. Section 112(1) and (2).

### E. Inequitable Conduct

#### 20.

The Courts have held over the years that the relationship between a patent applicant and the examiner is one of trust and confidence requiring the highest standards of honesty and candor on the part of the applicant. See *Precision Instrument Mfg. Co. v. Automatic Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Norton v. Curtiss*, 433 F.2d 779, 167 U.S.P.Q. 532, 57 CCPA 1384 (1970). This duty of disclosure and candor is codified in 37 C.F.R. § 1.56. The rule provides in part:

a. A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantially involved in the preparation or prosecution of the application and who is associated, with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. The duty is commensurate with the decree of involvement in the preparation or prosecution of the application. The duty rests not only upon the inventor and his counsel but upon every other individual who is substantially involved in the preparation of the application and who is associated with the inventor or assignee.

d. No Patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or gross negligence.

The claims in an application shall be rejected if upon examination pursuant to 35 U.S.C.A. 131 and 132, it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with any previous application upon which the application relies, or (2) that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, or in connection with any previous application upon which the application relies.

#### 21.

■ Inequitable conduct practiced with respect to one patent with a group of closely related and commonly asserted patents renders other patents within that same group unenforceable. See *Keystone Driller Co. v. General Excavator*, 290 U.S. 240, 246–47, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933). Thus, any inequitable conduct with respect to any of the patents in suit renders the others unenforceable as well. Since the '846 and the '250 patents issued from a single patent application and the '250 patent relies upon the '846 patent application for priority the inequitable conduct as to the '846 patent application would also bar enforcement of the '250 patent.

#### 22.

■ In order to show a violation of the duty of disclosure or candor, Comm Scope has the burden of showing by clear and convincing evidence (1) prior art or other information that was not called to the attention of the Examiner that was material to the examination of the patent applications that resulted in the patents in suit; (2) knowledge chargeable to an individual substantially involved in the preparation or prosecution of the patent applications of that prior art and of the prior art or information's materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the Examiner or gross negligence. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415, 5 U.S.P.Q.2d 1112, 1115 (Fed.Cir.1987). However, intent to mislead need not be

proven by direct evidence but may be shown by gross negligence or by showing acts the natural consequences of which are presumably intended by the actor. In *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1560, 223 U.S.P.Q. 1089, 1092 (Fed. Cir.1984), the Court stated:

> "Inequitable conduct" also requires proof of a threshold intent. That intent need not be proven with direct evidence. *Hycor* [*v. Schlueter Co.*] 740 F.2d [1529] at 1540, 222 U.S.P.Q. [553] at 561. [(Fed.Cir.1984)] It may be proven by showing acts the natural consequences of which are presumably intended by the actor. *American Hoist* [*v. Sowa & Sons, Inc.*] 725 F.2d [1350] at 1363, 220 U.S.P.Q. [763] at 773, [(Fed.Cir.1984)]; *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151, 219 U.S.P.Q. 857, 868 (Fed. Cir.1983). Proof of deliberate scheming is not needed; gross negligence is sufficient. *Hycor*, 740 F.2d at 1540, 222 U.S. P.Q. at 561. Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of withheld reference. *Driscoll v. Cebalo*, 731 F.2d [878] at 885, 221 U.S.P.Q. [745] at 751, [(Fed.Cir.1984)]; *Kansas Jack, Inc. v. Kuhn*, 719 F.2d at 1152, 219 U.S.P.Q. at 862. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. *Orthopedic Equip. Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383, 217 U.S.P.Q. 1281, 1286 (Fed.Cir.1983).

23.

In *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362–63, 220 U.S.P.Q. 763, 773 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), the Court recognized that the question of intent must be assessed in light of the materiality of the withheld information. As the Court stated in *Stevens*, 747 F.2d at 1560, 223 U.S.P.Q. 1089, 1092–93:

> Once the thresholds of materiality and intent are established, the Court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred,

*American Hoist*, 725 F.2d at 1364, 220 U.S.P.Q. at 774. If the Court reaches that conclusion, it must hold that the patent claims at issue are unenforceable.

24.

■ Undisclosed prior art or information is material if there is a substantial likelihood that a reasonable examiner would have considered the undisclosed reference important in deciding to allow the application to issue as a patent. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 992, 6 U.S.P.Q.2d 1601, 1608 (Fed.Cir.1988). The withheld prior art or information does not have to render the claimed invention anticipated or obvious. The standard to be applied is not whether a particular examiner would consider the material to be important or whether he was actually misled by the alleged misrepresentations; rather, the standard is whether a reasonable examiner would have found the withheld prior art or information important in deciding whether to permit the claims to issue. *Western Elec. Co. v. Piezo Technology, Inc.*, 860 F.2d 428, 433, 8 U.S.P.Q.2d 1853, 1857 (Fed. Cir.1988).

25.

As disclosed in the Court's findings of fact, the inventors and their counsel knew of highly material prior art and information but failed to call it to the attention of the Examiners who had the principal responsibility for the applications which resulted in the patents in suit. This prior art and information was important enough that, in the Court's opinion, disclosure of it would have prevented the claims of the patent to issue. Balancing of the factors of intent and materiality leads this Court to conclude that United States Patents Nos. 3,567,846, 3,693,250 and 3,529,340 are unenforceable for violations by their inventors and their counsel of the duty of candor and disclosure.

*F. Damages*

26.

■ Trilogy seeks to recover its alleged lost profits as the measure of its damages.

In order to establish lost profits Trilogy must show by a preponderance of the evidence the following:

1. A demand for the product made according to the patents in suit during the period in question;

2. An absence during the period of acceptable noninfringing substitutes;

3. Sufficient manufacturing and marketing capability to exploit the demand, and;

4. A detailed computation of the amount of the profit that Trilogy would have made on lost sales.

*Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1156, 197 U.S.P.Q. 726, 729–30 (6th Cir.1978); *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 788 F.2d 1554, 1555, 229 U.S.P.Q. 431, 432 (Fed.Cir. 1986). In short, Trilogy must prove by a preponderance of the evidence that "but for" Comm Scope's alleged infringement, it would have made all of the sales of Comm Scope's QR and adhesive P–III cable products. *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 863, 226 U.S.P.Q. 402, 409 (Fed.Cir.1985), *cert. denied* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

### 27.

As disclosed in the Court's findings of fact, Trilogy cannot meet the factual requirements for measuring its damages according to its alleged lost profits. In addition, Trilogy does not make any product in accord with the inventions alleged in the patents in suit. The Court has found no authority holding a patentee who does not practice the invention claimed in its patent is entitled to lost profits from alleged infringement of its patents. There are several cases which hold or imply that such alleged profits are not recoverable under these circumstances. *Velo–Bind, Inc. v. Minnesota Mining and Mfg. Co.,* 647 F.2d 965, 973, 211 U.S.P.Q. 926, 933–934 (9th Cir.1981) *cert. denied,* 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Trio Process Corp. v. Goldstein's,* 533 F.2d 126, 129, 189 U.S.P.Q. 561, 563 (3rd Cir.1976), *cert. denied,* 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 30 (1980); *Ellipse Corp. v. Ford*

*Motor Co.,* 461 F.Supp. 1354, 1379 (N.D.Ill. 1978), *aff'd* in unpublished opinion, 614 F.2d 775 (7th Cir.1979), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 792 (1980); *Saf–Gard Product, Inc. v. Service Parts, Inc.,* 491 F.Supp. 996, 967, 206 U.S. P.Q. 976, 978 (D.Ariz.1980).

In the *Trio Process Corp.* case the Third Circuit noted that the patentee had never practiced the process claimed in the patent and that "the only damage that the patentee suffered was the loss of royalties it would have received" had the infringing sales been licensed.

In *Saf–Gard Product, Inc.,* 491 F.Supp. at 1007, the Court analyzed the damages recoverable for infringement as follows:

In determining the measure by which infringement damages are to be assessed, it is necessary to first characterize the manner in which the plaintiff used its patent rights. If the plaintiff was in the business of granting royalty bearing licenses under its patent, then the damage sustained is the loss of royalty income occasioned by the defendant's infringement. *If the plaintiff has chosen to manufacture the patented product and to exclude all others from doing so, then the damage sustained is the loss of profits occasioned by the defendant's infringement. In cases where the plaintiff has neither manufactured the patented product nor licensed others at an established royalty rate, the Court must hypothesize "a reasonable royalty" upon which the parties would have agreed prior to commencement of the infringement.* (emphasis added)

In the case at bar neither Trilogy nor General Cable manufactured any product that is alleged to be subject to any of the patents in suit at any time during the period of the alleged infringement. The Court therefore concludes that since they did not manufacture the patented product or otherwise practice any of the alleged inventions, Trilogy is entitled to recover, at most, a reasonable royalty.

28.

A reasonable royalty is the amount a person, desiring to manufacture, use or sell the patented invention as a business proposition, would be willing to pay as a royalty and yet be able to make [use or sell] the patented article, in the market, at a reasonable profit. *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568, 224 U.S.P.Q. 259, 269 (Fed.Cir.1984). It is a hypothetical royalty resulting from arms length negotiations between a willing licensor and a willing licensee. The factors to be considered in setting a reasonable royalty include royalties paid by others in the industry for use of a comparable patent. *American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 462–64, 227 U.S.P.Q. 299, 302 (Fed.Cir. 1985). Strong evidence of a reasonable royalty is an established royalty used in the marketplace for similar patents. *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1562–63, 219 U.S.P.Q. 377, 386 (Fed.Cir.1983).

29.

As disclosed in the findings of fact, an industry-wide established royalty rate of seventy-five one hundredths of one per cent (.75%) exists for technology relating to coaxial cables similar to that claimed in the patents in suit. The Court concludes that if Trilogy is found to be entitled to recover any damages in this cause that it would be a reasonable royalty and that a reasonable royalty would be .75% of the sales of the products made in accordance with any of the patents in suit.

30.

In the amended complaint, Trilogy alleges that Comm Scope willfully infringed the patents in suit. In order to show willful infringement Trilogy must show that the Defendants had no reasonable basis for believing that they had a right to do the alleged infringing acts. *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540 (Fed.Cir.1984), and *Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed.Cir. 1983). The evidence shows that the Defendants held such a belief and the Court concludes that they have not committed willful or wanton infringement.

31.

In order for the M/A–Com, Cable Home Communications or General Instrument to be held liable for any of Comm Scope's alleged acts of infringement, Trilogy must show by a preponderance of the evidence that they committed some act of infringement or that Comm Scope is the alter ego or instrumentality of one or more of said corporate Defendants. *B.W. Acceptance Corp. v. Spencer*, 268 N.C. 1, 149 S.E.2d 570, 576 (1966). There is no evidence of record that Comm Scope is the alter ego or instrumentality of either M/A–Com, Cable Home Communications or General Instrument. Consequently, the Court concludes that neither M/A–Com, Cable Home Communications nor General Instrument can be held liable for any acts of Comm Scope. Moreover, inasmuch as there is no evidence that any of these additional Defendants have ever made, used or sold any product, method or apparatus accused of infringing the patents in suit, the Court concludes that all claims against M/A–Com, Cable Home Communications and General Instrument should be dismissed with prejudice on the additional ground of lack of evidence. 35 U.S.C.A. Section 271.

32.

Both Trilogy and Comm Scope have moved the Court for a determination that this is an "exceptional" case under 35 U.S.C.A. Section 285 and an award of attorney fees. The Court concludes that this is not an "exceptional" case within the meaning of Section 285 and declines to assess any attorney fees. All motions for sanctions filed by the parties will also be denied.

33.

The Court concludes that Claims 1, 2, 3, 6, 7 and 8 of the United States Patent No. 3,567,846, Claims 1, 2, 3, 4, 6, 8 and 13 of United States Patent No. 3,693,250 and Claims 1, 2 and 3 of United States Patent No. 3,529,340 are invalid, and none of these claims has been infringed by any of the Defendants in this action nor by any product, process or apparatus made, used or

sold by any of these Defendants. The Court also concludes that these patents are also unenforceable because they were obtained through violation of the duty of disclosure and candor.

A judgment in accord with these findings and conclusions will be entered simultaneously with this Memorandum of Decision.